BAKER *et al.* *v.* CARGO AND MATERIALS OF THE SLOBODNA.

*(District Court, S. D. Florida.  May 3, 1887.)*

SALVAGE—COMPENSATION..

The ship Slobodna, laden with 4,500 bales of cotton, went ashore on the Florida coast. After a few hours the assistance of libelants, all licensed wreckers, was accepted, but after 24 hours' effort to get her off, the anchor dragged, the vessel swung further aground, and soon filled. The vessel was lost, but the cargo nearly all saved; 335 men and 41 vessels were engaged 28 days, besides 9 vessels and 69 men, who assisted in saving 861 bales. Most of the cotton was taken from 6 to 18 feet of water, by naked divers without appliances, with more than ordinary labor. *Held*, it appearing that the salvors did their duty in attempting to save the property, that they are entitled to 25 per cent. on cotton saved dry, valued at $46 per bale; 33⅓ per cent. on that partly wet, and valued at $38; 40 per cent. on that saved from less than 6 feet of water; and 50 per cent. on that saved from more than 6 feet of water; and on materials and stores, valued at $2,751, 45 per cent.

In Admiralty.    Libel for salvage.

*L. W. Bethel* and *W. C. Malonex*, for libelants and petitioners.

*G. B. Patterson*, for claimants.

LOCKE, J.    This vessel, laden with 4,500 bales of cotton, from New Orleans, bound to Reval, went ashore on a projecting point of rock between French and Pickles reefs, on the Florida coast, about 100 miles from Key West, at about 9 o'clock on the morning of the 16th of March, 1887, where she was soon boarded by the principal libelant in this case, who offered his assistance.    The vessel lay upon the extreme outer point of the reef, in an open and exposed position, on hard rock bottom.    She was under considerable sail, with a fresh wind, when she struck, and went ashore so as to be lifted, at high water, fully two feet from her ordinary draft.    For a time the master thought he would be able to get his vessel afloat, so declined to accept aid; but at length, at about 4 o'clock that afternoon, finding his efforts ineffectual, he accepted the assistance of the libelants, all professional, licensed wreckers, with several of their vessels.    They carried out a 4,000-pound anchor, with 30 fathoms of chain and 85 fathoms of 8-inch hawser, and let it go in deep water, and, as the tide rose, heaved heavy strains with all the power they were able with a fourfold purchase led to the capstan.    A part of the libelants manned the pumps, as there was found to be six feet of water in the hold, and finally reduced it to four feet.    They hove with what force they could until two hours past high water that night, but were unable to move the vessel.    A portion of the libelants then went to breaking out and moving cotton aft; others constantly pumping in order to keep the water down.    The next morning a schooner was hauled along-side to take cotton, but by the time she had received 29 bales the wind increased and the weather became so bad that she was compelled to drop off, and all the vessels, with one exception, had to leave their anchorage outside the reef and go inside to seek a harbor, leaving 60 of the libelants on board. These continued pumping, breaking out, and moving cargo aft, and heaving at the anchor. as the tide rose.    At 4 o'clock that afternoon—the 17th—the weather became worse; the wind shifted to the southward,— a dangerous point,—and a violent squall struck the ship with such force as to lift her off the bottom, so that the libelants succeeded in moving her astern, nearly, if not quite, half her length, but unfortunately the anchor at that time dragged; the ship, partly relieved from the bottom, swung broadside upon the reef, and thumped and pounded heavily, increasing the leak so rapidly that within 40 minutes the water gained, notwithstanding constant pumping, from 4 feet to 15, the depth she was in, where it continued.    After pumping a long time the libelants concluded that the vessel had bilged, and proceeded to save cargo.

The salvors already represented by libel or petition have saved 4,310 bales, and an amount of loose cotton estimated at about 142 bales, and others are still at work saving what yet may be got from the wreck.    It is true, the vessel has been lost, but the cargo has or will be almost entirely saved, though in a damaged condition.

There were 335 men and 41 vessels, two of which were steamers, engaged in the general consort, and who worked all the time the weather would possibly permit, for a month, lacking 2 days. Part of the time it was impossible to work on board or lie along-side. Nine vessels and 69 men have also worked more or less on their own account, and saved 861 bales outside of the general consort. The work has been laborious in the extreme; the bales of cotton were pressed into the ship with much force at first, and, being wet, had become greatly swollen. They were very heavy, many of them weighing over a half ton as they came out of the water. During the latter part of the service the bottom of the vessel was so crushed up that it held the bales under the beams, so that it was almost impossible to break them out. Many of them were broken, or necessarily pulled apart, until the water was filled with a pulpy mass of loose cotton, broken ties, and dunnage that made it very difficult, and, to a certain extent, dangerous, to dive through it. The vessel so worked herself down into or among the rocks that there was 17 or 18 feet of water through which the lower tiers of cotton were dived up. The salvors had no appliances for diving or saving labor, but it all had to be dived for by naked divers, and hoisted by hand. The bales had become so saturated and heavy that they would not float, but each had to be broken out and slung under water. About 1,700 bales have been dived up from more than 6, and from that to 18, feet of water, and about 150 of loose saved in the same way.

The great question in this case that must influence the amount of salvage is, Did the salvors do their whole duty in their attempts to save the property? *First*, was there any dereliction of duty in not preventing the vessel from swinging again harder aground when partly relieved from the bottom? And, *secondly*, could they have pumped out and saved her, after she had been partly lightened of her cargo? Salvors are held to a strict accountability for everything which is omitted to be done by them for the saving of property by every means within their power; and if from lack of energy, judgment, or skill they fail in one particular, the amount of salvage awarded, if any, will be reduced accordingly. It is not only honesty of purpose, but skill, energy, and good judgment in using every appliance which they can possibly command that is demanded. But courts cannot require impossibilities of them and must only consider the means under their control. In this case, was it within their power to have foreseen and prevented by any degree of care or diligence the dragging of the anchor? In the case of *The St. James*, (records of this court, 1872,) the vessel was permitted to swing back onto the reef by the breaking of the hawser, when the salvors had shown a most deplorable lack of skill or judgment in using a small line to lengthen out a large hawser, when it was within their power to have used a larger one, or increased the strength of that used by several doublings; and the entire salvage was forfeited. But in this case the depth of water was properly selected, the largest anchor carried out in the best direction with the strongest hawser that could be obtained; the weight of the anchor was such that no reasonable man would have considered it necessary to back

it with another, but would have presumed it to hold, in bottom such as it was known to be, as much or more than the hawser. It seems that at the time of the service any one would have conceded that everything within the power of the salvors had been done to float the ship; and but for the change and increase of the wind, the suddenness of the violent squall and sea, and the accidental breaking out or dragging of the anchor through the rock where it first held, it would have been successful.

The suddenness and severity of the wind and squall prevented anything being done after the anchor had started until it was too late, and the vessel was evidently bilged and leaking so badly that no power of the libelants could control the amount of water in her. I am not satisfied that anything more could have been done to float the vessel than was before she was started from the bottom, or to prevent her going further ashore again, as she did.

After partly discharging her, the question was very properly suggested, both by the wreckers and by a board of survey, whether she could not then be floated and brought to port; but in order to have done that it would have been necessary to control the water coming into her, or undoubtedly she would have sunk in deep water. Had the libelants had at their command a powerful steam-pump, or had it been within their power to procure one, and they had not done so, and endeavored to float her, I should certainly consider them lacking in energy and enterprise requisite for such an occasion; but they had none. The master wrecker came to Key West and endeavored to procure one, but was unable, and upon his return found it too late, as the weather had been so bad that the vessel was undoubtedly so broken as to be beyond recover· They have therefore, I consider, done all they could do in saving the cargo, materials, and stores, and bringing them to a place of safety. What amount ought they to receive for this service? It is unquestionably a salvage service. The property was in jeopardy, in imminent peril of certain loss. It was only by such means as were used that it could be saved. It was an almost uninhabited coast, a hundred miles from any assistance, and several hundred from any except what did offer itself. It was on a dangerous reef, the approach to which is at all times more or less perilous to vessels. The weather was bad part of the time, and all the salvors' vessels were more or less exposed to dangers entirely different from those of ordinary navigation. The actual labor was arduous and long continued, although perhaps the number of men employed for the time occupied may not be a true measure of the actual labor performed, as a good deal of the time was taken up by the smaller vessels bringing cotton to Key West, discharging it and returning; and there was some of the time when it was impossible to work at the ship, as the sea was sweeping entirely over her, and all of those engaged in the service were compelled to lie at anchor inside of the reef. But their time was occupied either in working or waiting, and I consider the circumstances justified the employment of the large number, nor am I prepared to say that it could have been done with a smaller number, or in a shorter time.

It is true, the amounts to be awarded rest in the discretion of the judge

and the peculiar circumstances of each case; but, as remarked in *The Neto*, 15 Fed. Rep. 819, "this discretion should be controlled by certain general considerations which have been found to enter into the estimates made by courts." I do not consider that an admiralty judge should depart from usual rates given in similar cases, and decree, according to his feelings at a particular time, whether liberal and generous or otherwise, in salvage cases more than in any other class of cases. In questions of salvage, courts cite precedents of amounts, and, it is presumed, are guided by those cases nearest parallel in circumstances, unless some good reason is found for a variation. *Vide The John Albert*, 4 Add. Records, 537.

Numerous cases are found reported where the general features of the service are apparently almost identical with that rendered in this case, namely, where the vessel was lost, and the cargo saved with much labor and exposure. *The Brothers*, 2 Hagg. Adm. 195. £3,225 was given on amount of £9,680 saved. *The Fleece*, 3 W. Rob. 278. The ship *Argus* was lost on Charleston bar; the cotton saved, and brought to Charleston. Salvage on cotton one-third of the net, and on barrels of tar one-half. *The Argus*, Bee, 170. In *The Friendship*, Id. 175, one-fifth was given for $25,000 in specie, saved by four men in a canoe, although it is presumed this was intended to compensate for the entire service, which resulted in the probable saving of life. In *The John Gilpin*, Olcott, 77, one-fifth of the net was given. In the case of *The Camanche*, 8 Wall. 448, when the cargo of a heavy character was brought up, although in the harbor, one-third was allowed. In the well-known and frequently cited case of *The Thetis*, 3 Hagg. Adm. 14, 2 Knapp, 390, there was given as salvage costs and expenses a trifle over one-third of the gross value of the property saved.

The records of this district abound with cases of like character, where the vessels have been lost, but the cargoes either entirely or very nearly all saved; and if not exactly similar in all respects, sufficiently so to deserve attention. In 1838 the ship *America* was lost on the Tortugas. Twelve vessels and 120 men saved property worth $151,464. On $122,-232 saved dry the court decreed 25 per cent.; on that saved wet, but without diving, 50 per cent., and 60 per cent. on that saved by diving. The total salvage was $47,971, being 31 per cent. of the value saved; and the shares of the men averaged $150. The ship *Telamon* was lost on Delta Shoals; the court allowed 27, 50, and 60 per cent. for saving cargo. *The Yucatan*, laden with cotton and pork, was lost near Cape Florida. The salvage was 43 per cent. on the cargo saved; shares, $62. *The Brewster*, cotton laden, was lost on Carrysfort reef; salvage, one-third. *The Isaac Allerton* was driven over the reef, and sunk in five fathoms water. Over 400 persons were engaged in saving cargo. One-half of the net value of the amount was decreed. In January, 1853, the ship *Nathan Kimbal*, cotton laden, went ashore but nine miles from Key West. Seven vessels and ninety-nine men saved cargo amounting to $56,093. Thirty per cent. was given on that saved dry, and fifty

per cent. on that saved by diving and working in the water. 4 Add. Records, 679. The brig *Cimbus*, loaded with heavy assorted cargo, machinery, etc., was lost. Fifty per cent. was given for saving her cargo. In September, 1849, 8 vessels and 120 men saved $50,227 worth of cargo from *The Maryland* on Alabama reef, and bilged. Thirty-six per cent. was given on the net value. In 1839 the ship *May Howland* was lost on the reef, but cargo saved that sold for $23,651, upon which 43 per cent. was given. In 1837, 45 per cent. was given on the cargo of the ship *Alfred*, lost on Carrysfort reef. In 1840 *The Cora Nellie* was lost near Tortugas, but $29,153 worth of cargo saved. The court gave 47 per cent. salvage. In 1836 the ship *Ajax* was lost, also on Carrysfort reef. Thirty-five per cent. was given on the dry, and fifty per cent. upon the damaged. In 1840 the ships *Emery* and *Norway* were lost on the reef, but a large portion of their cargoes saved. In the former 47 per cent., and in the latter 45 per cent., was given. In 1848 the ship *Kristrel*, loaded with cotton, was lost on the reef. One thousand four hundred bales were saved, of which one-third was given as salvage. In 1842, the cargo of the ship *North America* was saved, and a salvage of 45 per cent. given. The same year cargo from the ship *Tellumah* was saved, valued at $26,841, upon which a salvage of $11,931 was given. In 1853, in the case ship *Elizabeth Bruce*, 45 and 50 per cent. were given for saving $8,276 worth of cargo. In 1855, 30 and 50 per cent. were given for saving $41,756 worth of cargo from the schooner *Athalia;* and 50 per cent. upon $6,535 worth of cotton from the ship *Concordia*, she having burned to the water line. In 1856 the ship *Mary Hale* was lost on Salt Key bank. Several vessels saved cotton from her cargo valued at $35,-364, upon which 36 and 45 per cent. was allowed. From *The Helen E. Brooks*, loaded with railroad iron, the cargo was saved, valued at $36,-227, upon which $22,754 salvage was given. In 1857 assorted cargo to the value of $29,776 was saved from the ship *Pacific*, upon which 30 per cent. of the gross was given. In 1859, $41,281 worth of cotton was saved from the wrecked bark *Minnie*, and 33⅓ per cent. allowed upon the same. In 1858, $85,422.30 worth of cotton was saved from the ship *Mulhouse*. Twenty-five per cent. was allowed upon the dry, 45 per cent. upon the damaged, and 55 per cent. upon that saved by diving. In 1859, from the wreck of *The Indian Hunter*, salvors saved 3,432 bales of cotton, valued at $88,220. Salvage of 25 per cent., 42, and 50 per cent. was given upon the dry, damaged, or saved by diving. The last case cited was almost precisely similar in the locality, season of the year, and character of the service rendered with the one under consideration. In the same year 30 per cent. net was given on a cargo of cotton saved from the ship *Eliza Mallory*, and 25 per cent. and 40 per cent. on the gross value of that saved from the ship *Mary Coe*. These are a few of the cases of similar character as the present decided in this court previous to 1861, and in an opinion in *The Ocean Belle*, that year, Judge MARVIN remarks:

"The most usual rates of salvage for saving cotton on this coast, when the ship has been lost and the cargo saved, has been 25 per cent. on the dry, 40

per cent. on the wet saved without diving, but taken from under water, and 50 per cent., and in some instances 55 and 60 per cent., for saving it by diving in the lower hold."

Subsequently to that the rates in some cases, on account of the greatly increased value of cotton, and the large amount of property saved by the same parties within a short space of time, were considerably reduced. In the fall of 1865, during a severe hurricane, several large cotton ships were driven ashore or onto the reef, and more than a million and a half dollars' worth of cotton saved within a short space of time. The cotton was then appraised at from $75 per bale for the damaged to over $200 for the dry, and the ordinary rates were departed from, yet an amount decreed that paid the salvors more liberally than any salvage service has before or since. In the case of the cargo of the bark *Waltham*, saved mostly dry, with little labor, but 9 per cent. on a value of $205,000; and that from *The Bickmore*, with similar circumstances, 12 per cent. on $118,000 was given. But in that from *The Caroline Nesmith* there was given on $312,110 saved dry, 10 per cent.; $24,000, somewhat damaged, 30 per cent.; and $74,483 dived up, 33⅓ per cent., giving for saving about 2,200 bales, $60,665.89, or nearly $28 a bale, which was in amount the largest salvage ever decreed in one case in this court. On $190,522 saved from *The Howard*, 14 per cent. on the dry, and 40 per cent. on the damaged, was given; and on that saved from *The John Wesley*, 15 per cent. on the dry, appraised at 42 cents per pound, and 33⅓ per cent. of that damaged, valued at $75 per bale. In 1871 a portion of the cargo of the Spanish bark *Aquila* was saved, for which the court paid 27 per cent. on the dry, and 42 per cent. on that wet and damaged, and 50 per cent. upon that saved by diving. The steam-ship *Mississippi* was driven upon the coast above Cape Florida, where her cargo was saved by about 200 men, in 15 vessels from Key West, to the extent of $175,000. The court allowed 20 per cent. upon this entire amount. *The Northwester*, loaded with cotton, took fire while on a voyage from New Orleans. She came into the outer harbor of Key West, where she was run aground and scuttled, in too shoal water, however, to submerge her to any great extent. The government steamer *Arbutus*, with powerful steam-pump, to a great degree extinguished the flames, and the salvors aided what they could in putting out the fire by hand. Subsequently, after the upper portion of the vessel had been entirely burned off, they saved what remained of the cargo. Much of it was saved from under the water. The court considered that the property was nearly within the harbor, and the labor was less than in such cases ordinarily, and reduced the rates somewhat, giving 20 per cent. on the dry, 33⅓ on that wet, but not badly damaged, and 40 per cent. on proceeds of sale of materials and cargo so badly damaged as to be sold. The labor was arduous and disagreeable, and barely compensated the salvors; the men sharing but about $40 for nearly a month's work. In 1872 the brig *Amazon* was lost on the reef in the vicinity of where *The Slobodna* was, and her cargo, consisting of cotton, was saved in the same manner. Thirty-five per cent. was given upon the entire cargo. In the same year the ship *St. James*, loaded with 1,500 tons of railroad

iron, was lost on the same reef. The cargo was saved with great expos-
ure and labor. 50 per cent., 62 per cent., and 68 per cent. were given
upon the net proceeds of property saved by the salvors who arrived after
the first company had by their lack of energy failed in floating the vessel,
and to whom salvage was denied. In 1874, the British steamer *Mississippi*
was run onto Fowey Rocks, near Cape Florida, when she filled with water.
Her cargo, consisting of the coarser, heavier kinds of assorted merchan-
dise, cotton ties, hardware, earthen-ware, etc., was saved partly dry,
and partly by diving or hooking up from the bottom. The salvors were
saved much labor, as all the hoisting and discharging was done by the
hoisting engine of the steamer. Thirty, forty, and fifty per cent. was
given, according to the circumstances of each class of cargo saved, whether
dry from the top of the water or by diving. The crews of two of the
vessels that arrived first at the wreck shared $50, but the others from $15
to $32. In 1879 *The Mary E. Riggs*, laden with cotton, struck the reef
but a short distance from where *The Slobodna* went ashore, and bilged be-
fore the salvors were able to get her afloat. They saved 4,646 bales of
cotton, but the ship broke up before they could complete the service, and
about 300 bales went adrift. The court allowed 22 per cent. on the net
value of the dry, 33⅓ on that partly wet, 40 per cent. on that wet and
saved from less than 6 feet of water, and 50 per cent. on that dived up
from more than that depth. The salvors shared but $61, although en-
gaged for 24 days in a most unpleasant service. In June, 1883, the ship
*Northampton* went ashore on Tennessee reef, and bilged before the sal-
vors reached her. They saved about 1,500 bales of cotton, and 65,000
staves. Twenty-five and forty per cent. was given upon the cotton and
fifty per cent. upon the staves. The salvors were engaged 18 days in the
service, and their shares amounted to $42.80. In December, 1885, the
bark *Guttenberg* was lost on Bird Key shoal, one of the Tortugas group.
Twenty vessels and more than 200 men were engaged from 15th Decem-
ber until 16th January saving cargo. The weather was bad, and it
was during the coldest season of the year. A very large proportion of
the cargo was under water, and necessitated much labor and exposure in
diving it up. They saved 1,871 bales out of a cargo of 2,000, and about
2,000 staves, when the vessel went to pieces. Salvage of 25, 40, and 50
per cent. was given upon the value of that saved, according to the con-
dition and character of labor of saving it. The crews of the first three
vessels, who saved much of the dry cotton and materials, shared $82.
But the rest shared from $15 to $45, according to the amounts saved by
the different consorts.

These few cases will show that while the rates given in this district for
the services may seem high, the actual compensation has not been large.

It is to be regretted that the modern wrecking appliance has not been in-
troduced upon this coast; but the nature of the service, the extent of the
reef line to be watched, and the uncertainty of remunerative employment,
has so far prevented it. The character of the bottom—sharp coral rock
—demands that the assistance to be of service must be speedy. The in-
troduction of improvements requires the concentration of capital at one

point, that the lack of means of rapid communication renders oftentimes useless.

In this case the cargo has been appraised, by appraisers appointed by this court, in its present condition and circumstances, at $46 per bale for the dry cotton, $38 per bale for that partly wet, $27 for that wet, and $16 per bale for the loose cotton, and no objection has been made to the same. The materials and stores have been sold for $2,751, and the proceeds brought into the registry of the court.

Considering the entire case and all the surrounding circumstances, it is ordered that from the foregoing values all the expenses of landing, storing, watching, and labor heretofore incurred and the costs herein be deducted, and the libelants and petitioners have, receive, and recover the following rates of salvage on the net values so found of the quantities severally saved by them, to-wit:

On the cotton saved dry and appraised at $46 per bale, 25 per cent.

On that partly wet and appraised at $38 per bale, 33⅓ per cent.

On 435 bales wet saved from water less than 6 feet, 40 per cent.

On the balance wet saved by diving in water more than 6 feet in depth and loose, 50 per cent., and on the proceeds of materials and stores, 45 per cent. This will give the salvors engaged in the entire service between $45 and $50, and others, who worked a portion of the time in saving special lots, a somewhat less amount, according to the amounts saved by them.