## THE THORNLEY.

(Circuit Court of Appeals, Fifth Circuit. December 12, 1899.)

### No. 841.

**1. SALVAGE—AMOUNT OF RECOVERY—NATURE OF SERVICES.**

Where a vessel, grounded on a dangerous reef, where she suffered injury from pounding, even during calm weather, was released, entirely through the efforts of her salvors. only in time to escape a gale, in which she would certainly have been destroyed, and she had in her cargo a large quantity of dynamite, on account of which the services rendered were believed at least to be attended with considerable risk, they cannot be considered as of a low order of salvage services, to be sufficiently compensated by payment for the actual labor expended.

**2. SAME—REVIEW ON APPEAL.**

Where an award made for salvage services is based on correct principles, and is not clearly exorbitant, it will not be interfered with on appeal, although it may be greater than the appellate court would have allowed.

**3. SAME—VALIDITY OF CONTRACT FOR COMPENSATION.**

A contract for salvage services, made at the instance of the master of a grounded vessel. who was also a part owner, after such services had commenced, and when the salvors expressed a willingness to continue such services, and allow the amount of compensation to be fixed by the courts, will be upheld, where there was no fraud, misrepresentation, or other misconduct on the part of the salvors, and it appeared that the master was as fully advised as any one of the situation, and as competent to act for himself and the other owners, and where by the contract the salvors relinquished any lien they might have had on the cargo salved, and agreed to accept a stipulated sum, the payment of which was entirely contingent upon the saving of the vessel.

**4. SAME—CONSTRUCTION OF CONTRACT—VESSEL TO BE SAFELY DELIVERED IN PORT.**

A salvage contract, by the terms of which no payment for the services rendered was to be made unless the vessel was delivered "safely" in port, does not require that she shall be delivered without injury, where, at the time the contract was made, she was grounded in such a position that she was continually receiving injury, but only that she shall be delivered in a safe place.

**5. SAME—ACTIONS—PLEADING.**

Where a libel to recover for salvage services set out a full history of such services, including a contract for compensation made after the services had commenced, and prayed for the sum named in the contract, to which libel no exceptions were filed, but the answer expressly put in issue the validity of the contract, under the liberal rules of pleading in admiralty, it is competent for the court, on finding the contract to be valid, to treat the suit as one based thereon, and to decree compensation to the libelants with its terms.

**6. SAME—REASONABLENESS OF CONTRACT.**

A contract for the payment of $20,000 for salvage services, contingent upon their success, is not so exorbitant that it will not be enforced, where the vessel, which, with her cargo, was of the value of $105,000, was grounded upon a dangerous reef, where vessels had previously gone to pieces, where there was no other assistance available, and as a result of the services both vessel and cargo were saved, with slight loss.[1]

Appeal from the District Court of the United States for the Southern District of Florida.

On the 1st of December, 1898, the steamship Thornley, Legg, master, bound from New York to Tampico, ran on the part of the Florida coast known as "Pickles Reef." She had a cargo of about 3,800 tons of coal; also a quantity of dynamite, being four shipments, aggregating 3,350 cases, weighing net 79,829 kilograms, nearly 80 gross tons weight, which was stowed in the stern of the ship. The ship grounded at a quarter past 8 in the morning, running at full speed, and she went upon the reef from her bow to amidships before she stopped. It was within an hour and a half of high water. There were two large boulders under the ship, one beneath No. 2 hatch. There is a slight difference as to the soundings around the wreck. Both sides agree that she was lifted by the reef forward over three feet. The character of the bottom—boulders, with sharp coral projections with sand holes—partly accounts for variations in the soundings. After the tide had receded about one-fourth, Capt. Baker took casts of the lead as follows:

|  | Starboard Side. | Port Side. |
|---|---|---|
| Opposite stem. | 17 feet. | 17 feet. |
| Abreast fore chains | 14 | 19 |
| Amidships | 19 | 19 |
| Under engines | 17½ | |
| Under stern | 27 | 20 |

The ship's proper draft was 20 feet 6 inches forward, and 21 feet 9 inches aft. At this time Capt. Baker says the ship was heading S. W. by W. ½ W. Capt. Legg claims he was heading one point more to the southward, but he admits his compass was "out" three degrees. His log book, on the day of the stranding, has an entry of a westerly deviation of 3° 20'. The wind was moderate from N. N. E. The diagram from the Coast Survey Chart, in the record, shows that the ship went on between Pickles and Conch Reefs, and had driven so far inshore as to be well to the westward of, and within, the range extending from the light on Alligator Reef to Conch Beacon. Capt. Legg at once reversed the engines full speed astern, and then ordered his men to jettison cargo. Capt. Baker, one of the libelants, a licensed wrecker on the Florida coast for 23 years, residing at Key Largo, observed the steamer aground, and

---

[1] Awards in federal courts, see 30 C. C. A. 280.

went out in his wrecking schooner, arriving at the Thornley between half past 9 and 10. There were already other vessels alongside,—two or three schooners, with small boats, four in all. Capt. Baker hailed Capt. Legg, and proposed to save his cargo being jettisoned, and offered to get barrels to take off the coal, and was finally permitted to take measures for getting the ship afloat. He then arranged to take out the Thornley's starboard anchor. The schooner was brought alongside, the lines of the other boats taken, and the steamer's starboard anchor (4,200 pounds), with 15 fathoms of chain and 90 fathoms of wire, carried out astern of the Thornley, and a line made fast to the steamer's winches. Subsequently the steamer Miami, a vessel of 1,500 tons, plying between Miami, Key West, and Havana, also took a hawser from the Thornley's port quarter, and brought all her power to bear, with the result that the Miami broke the hawser, and then went away. During the afternoon the crew was engaged discharging coal. Capt. Baker and the salvors brought barrels from shore, cut some up into tubs, and at 1 o'clock began discharging the coal, with the salvors' men also below filling the tubs. Later in the day an attempt was again made to heave on the anchor, aided by the engines full speed astern, but without effect. The salvors continued discharging coal throughout the night, working all the hatches except No. 3, which could not be used, as the winch at that hatch was required to heave on the anchor.

In the beginning no arrangement was made for compensation, as the work had been proceeding on the usual salvage basis. On the first day there were more than a hundred men from shore working on the ship. In the afternoon of that first day, Capt. Legg requested Capt. Baker to come into the cabin to have a talk. As to this interview Capt. Baker testifies as follows: "After all my men had gone to work, about one o'clock that same day, after I had come aboard of the ship, the captain said to me, 'I would like for you to go down in my cabin; I want to have a talk with you.' I went down in this cabin, and he told me that he had eighty tons of dynamite in his number four hatch, and he would like for me not to tell my men; that he thought they would not like to work aboard the ship, because they would be scared, and would go away, and would not work; and I told him I would not tell the men. He says then, 'I would like to enter into an agreement with you to say how much you will take my ship off for.' I then told him that I did not wish to enter into an agreement on the reef; that I had entered into several agreements, and found they were not worth the paper they were written on. If he entered into an agreement, he must state that he entered into it freely and voluntarily, and that I was not taking any advantage of him. He then asked me what I would take it off for. I told him that I would not make any offer, but what would he be willing to give. He told me, under the circumstances, with the dynamite on board, he thought it was a great risk, and said that twenty thousand dollars would be enough, and be reasonable for all interested. Then he wrote the contract,—agreement,—and then called his first and second officers down in the cabin, and they witnessed, and I did also. * * * Q. At what time, captain, was it that the contract was made and signed? A. It was somewhere about one o'clock p. m. Q. How long had you been working then? A. Not more than a half hour. Q. Now, previous to the making of this contract, did you have any conversation with the master in regard to the value of your services being determined by the court? A. We did, sir; and I offered to do it, and would rather have it settled by the court; and he asked me what court we had here, and I told him, 'United States admiralty court.' Q. What did he say as to that? A. He said he would rather enter into an agreement, and know what it would cost to relieve the ship; that he and his two brothers owned a large portion of the ship."

On the subject the master testifies as follows: "Q. Is it the fact that Baker offered to do this on a salvage basis, and take what the court gave him? A. I understood him to say that when he came on board at first. Q. But you preferred to do it by contract? A. After some trouble, some two or three hours considering the matter, I concluded it was better for the interests of all concerned that I should have an agreement with him. Q. And this agreement that was drawn up was in whose handwriting? A. My own. Q. Is this copy that is annexed to the libel (Exhibit A),—is this the copy of it? Just look at it. A. Yes; I consider that is. I haven't the original before me, but I consider

that is a copy. Q. Did you consult with Mr. Welling, the first officer, and Mr. Landers, the second officer, at the time of the making of this agreement? A. No. Q. I see their signatures are on as witnesses. A. Yes; I read the agreement in their presence, and asked them to sign it. Q. As near as you can tell, what time in the day was it when this agreement was made? A. I should say about four o'clock in the afternoon. Q. That is, you had already been on the reef then? A. For eight hours. Q. Had any work proceeded before the paper was signed? A. Yes. Q. You say that Captain Baker didn't really care for a written agreement of this kind? A. I don't know that he cared. What the man said to me was this: If I preferred to sign an agreement— It was words to the effect that he didn't consider it worth the paper it was written on. Q. Did you have any discussion before you reached the sum of $20,000? A. No; I asked him to sign the agreement, and he said this. Q. Who suggested the $20,000? A. He, himself. Q. Then you were not obliged to make any such agreement, and it was rather your idea to have the agreement? A. It was my own idea."

The salvage contract entered into reads as follows:

"S. S. Thornley.

"It is this day mutually agreed between John Legg, master of the above steamer, and Capt. Enoch Baker, master wrecker, that the said Enoch Baker agrees to float the ship off Florida reef, and deliver safely in the port of Key West, for the sum of $20,000 (twenty thousand dollars). If the ship is not floated off the reef, no payment to be made.

"Dec. 1, A. D. 1898.

"[Sd.]                                          John Legg, Master.
"[Sd.]                                          Enoch W. Baker.

"Witnesses:
     "S. Waldo Welling, 1st Officer.
     "Frank Ellsworth Landers, 2d Officer."

At 7:20 p. m. the hawser was again hove taut, and engines went full speed astern, which was continued till 10:15, when the log shows the engines were stopped, "ship not moving." From 11 p. m. till morning the discharge of cargo was continued. At 7 a. m. Friday the steamer's stream anchor (2,000 or 2,500 pounds) was taken out by the wreckers' boat Winfield, with 180 fathoms of 5-inch manila rope from the port quarter, and another ineffectual attempt was made to heave the ship off. Between 9 and 10 a. m. the tugboat Geo. W. Childs came and pulled on the steamer. The log records: "Ship swinging slightly on center. Noon. Wind east. Sea raising. Ship rolling and grinding. Found 1 & 2 tanks leaking; also starboard 1 & 2 bilge and port No. 2. Wind freshening."

Capt. Legg testified: "Q. What was the effect during Friday on the vessel? A. She was striking heavily on the reef,—rolling heavily and grinding. The more solid the ship was on the reef, she didn't roll so much. Q. Did it have any effect upon your vessel in the way of showing leaks? A. Yes; she began to leak when she began to knock about. Q. When was that? A. During the early hours of Friday morning. Q. Where was that leak indicated? A. She leaked slightly in the bilge,—in the No. 2 hold and the bilges,—and she leaked considerably in the No. 1 and 2 tanks; No. 2 particularly. Q. How much water was there? A. I think during the night something like 34 inches of water accumulated in No. 2. Q. Were there any other indications of strain on the vessel besides this leak? A. Yes; I knew the ship was straining. I could see the effect of it on the cabin. The doors wouldn't close, and the mantelpiece in the cabin was smashed, and the marble hearth was broken. Q. The mantel was of marble? A. Yes, sir; and the hearth marble tiles. Q. They cracked? A. Yes."

Naturally, this state of things caused great alarm and solicitude regarding the dynamite, which was stowed aft between the cabin. Capt. Baker testifies: "On Friday morning, about two o'clock, the ship commenced to pound very heavily on the reef. I had gone down in the cabin to rest myself a little while, and I told the captain to call if he wanted me, and I would come immediately, and left a foreman to superintend the work. I hadn't been there

more than twenty minutes when the captain came and spoke to me, and asked me if I was not afraid to lie down there; that the ship was pounding so heavily that at any time one of those cartridges might explode, and explode the entire amount, and not only the vessel, but all the vessels around it, and possibly everybody would be killed, and the houses of Key Largo, too; that it would be as bad as if the entire amount should explode. Q. What was done then? A. I told him, then, to let me take the cargo. I says, 'I haven't a vessel that is large enough to take the whole of the cargo, but I can take the small schooners alongside, and put it on their decks, and take it out in the Gulf, and throw it overboard. He said, 'Have you ever handled dynamite?' and I said, 'No.' He said, 'If you take that dynamite on your vessels, and go out in the Gulf into fifty fathoms of water,' and he says the first case that strikes the bottom is likely to make a concussion that will explode all on the deck. He says then, says to me, 'Can't you send to Key West, and get a vessel large enough to take off enough to relieve the vessel the next tide?' I told him I thought I would relieve the ship the next tide."

The master of the tug Geo. W. Childs was finally induced to proceed to Key West for this additional vessel to take off the dynamite. On this occasion Capt. Legg had a conversation with Capt. Ocasta, a pilot not interested. Capt. Ocasta testifies as follows: "That very day, about the time I was talking to him, the tide then was about to slack, and the ship was pounding pretty heavily aft, and every time she would strike he would jar himself, and I says, 'What is the matter, captain?' and he says, 'Don't talk about what is the matter; I am scared.' 'We are standing here now,' he says, 'and we don't know what minute we may go up.' I said, 'You never heard of sailors going up; they always go down.' And he stated right there that there was eighty or eighty-four tons of dynamite in the No. 4 hatch."

The log notes that there was "quite a roll on," and that they continued discharge of cargo. At 8 p. m. another attempt was made to heave the vessel off, and at 12:15, shortly after midnight, they desisted, as the vessel did not move. Saturday morning they were again engaged casting over cargo, and found that tank No. 2 had leaked so as to fill 34 inches. At 9:45 again the attempt was made to heave the ship off and work the engines astern. The Thornley moved slightly, and then quickly, off the reef. Though the engines were stopped as soon as the motion astern was felt, they were unable to pick up the starboard anchor and chain, which had to be let go to allow the ship to go back far enough to float in deep water. Some 600 tons of coal had been taken out to lighten the ship. Except the occasional use of the ship's donkey engines, all this shoveling, hoisting, and discharging of coal was done by the wreckers. About 40 vessels were engaged, and after the first day some 204 men were employed in the day and night gangs into which this wreckage force was divided.

The Thornley then proceeded to Key West. Her log entries during the stranding were written up, and read over to the libelant, who, at the master's request, signed his name at the foot of each page, in attestation of the details recorded. On Sunday morning libelant arrived with the Thornley at Key West, where she was safely anchored, and the salvage service then concluded. All that day Sunday it blew a gale, so severe that even in the port of Key West the master had considerable difficulty in getting ashore from his steamer.

On December 7th a libel in admiralty was filed in the district court for the Southern district of Florida by Capt. Baker and his associate wreckers. It averred the facts of the stranding; the wrecking operations, with the result; and alleged that the master requested an agreement, which was set forth, a copy being appended to the libel; which concluded with the prayer "that this honorable court will be pleased to decree to the libelants the sum of $20,000 as a reasonable and proper salvage in proportion to the value of said steamship and cargo." The answer denied that libelants had jettisoned as much as 600 tons of coal; that the reason the master sent the tug Geo. W. Childs to Key West "was for the reason that the salvors would not work at discharging the dynamite, which comprised a part of his cargo, and, further, for the reason that salvors had no vessel of sufficient tonnage to take the same." Regarding the contract, the answer continued: "Twelfth. For further answer to this libel, respondent says that it is true that he entered into a contract with salvors to

relieve his vessel for the sum of twenty thousand dollars ($20,000.00), but that said contract was made by him while upon the reef, and without his having an opportunity to communicate with his owners or agents, and that the same was made under duress, and is out of all proportion to the value of the ship and cargo, the skill displayed, and the risk and danger of salvors. Thirteenth. For further answer to said libel, this respondent says that the services of the salvors were never especially meritorious nor skillful; that the service which they performed was an ordinary one, and consisted mainly of jettisoning cargo and running an anchor, and did not require the exercise of any great skill, nor were salvors or their vessel exposed at any time to any great risk." It was stipulated that the Thornley was worth $80,000, and her cargo $25,000, making in all $105,000.

The district judge (Honorable James W. Locke) held (1) that there was no inconsistency in pleading the contract and averring the salvage services; (2) that the contract was entered into fairly, without fraud, concealment, or pressure, and the amount was neither exorbitant nor extortionate. A decree was rendered for libelant for the sum contracted for, less $500, the value of the anchor and chain lost by the salvors, making a net recovery of $19,500. The claimant of the Thornley has appealed, and assigned as error the action of the court in treating the suit as on contract, and in sustaining the contract, and in decreeing the sum of $19,500 for the salvors' services.

Wilhelmus Mynderse, for appellant.

Harrington Putnam, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After stating the facts as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

Pickles Reef is a well-known dangerous reef, being exposed to the full force of the sea from northeast and around to the south. The Oxford (D. C.) 66 Fed. 584, 590; Baker v. The Slobodna (D. C.) 35 Fed. 537. When the Thornley was aground on that reef, she was in a position of imminent peril. While the weather was clear she pounded, and from that and her violent grounding she was decidedly strained and set aleak. Such being her condition in ordinary weather, nothing but destruction was before her if she had remained aground to encounter the stormy weather that immediately followed her floating. Her release from this peril was entirely due to the services rendered by the libelant and his colleagues, which were onerous, faithful, continuous, and successful. Considering the consignment of explosives on board, supposed by the master, in accordance with popular opinion, to be very dangerous, there was an element of risk and danger, if not of gallantry and heroism, attendant upon the services. It is true there was no saving of life, but unquestionably, in the opinion of the master, there was great risking of life.

It is true that on the hearing evidence was brought forward tending to show that certain grades of dynamite, properly packed, are not dangerous, under ordinary circumstances, nor liable to be exploded by concussion; but the evidence is not sufficient for us to be able to say that dynamite of a high grade, like that on board the Thornley, is not dangerous, nor liable to be exploded by concussion, nor through decomposition, from which spontaneous explosion is said to sometimes follow. The evidence shows that these explosives require for safety great precaution in preparation, storing, handling, and shipping. They are not allowed to be carried on passenger ves-

sels, nor on all railroads, nor on any railroad except under special regulations. Under these circumstances, the salvage services rendered to the Thornley cannot be classed as a low order of salvage, to be sufficiently compensated on the basis of work and labor meritoriously rendered; and, considering the services and attendant circumstances, in connection with the stipulated value of the property salved, we are not able to say that the amount of $19,500, salvage actually allowed by the district judge, was in violation of any correct principle applicable to salvage services, nor that it was exorbitant to any such extent as of itself to show reversible error.

We have just decided, in The Trefusis, 98 Fed. 314, that where the salvage compensation is based upon correct principles, and cannot be said to be exorbitant, this court will not interfere, although the amount actually awarded may be in excess of the sum the judges themselves would have allowed. The contract for salvage was entered into after the salvage services had commenced. It was entered into at the express instance and request of the master of the Thornley. There was no intimidation, oppression, concealment, misrepresentation, nor other misconduct on the part of the salvors. The master, who suggested the contract, was fully advised of the situation. Aside from his position of master, he was personally interested as an owner in the ship. Unless his mind was decidedly unsettled, through fear of danger on account of the explosives on board, he was in full possession of his faculties, able and competent to represent owners. By the contract, the salvors released any lien they might have on the cargo salved; limited their demands to $20,000 in case of success, no matter what their time and expenses for service might be; and, in case of failure to successfully float the ship, they abandoned all claim, even to cargo saved by them.

"We do not say that, to impugn a salvage contract, such duress must be shown as would require a court of law to set aside an ordinary contract; but, where no such circumstances exist as amount to a moral compulsion, the contract should not be held bad simply because the price agreed to be paid turned out to be much greater than the services were actually worth. The presumptions are in favor of the validity of the contract (The Helen and George, Swab. 368; The Medina, 2 Prob. Div. 5), although, in passing upon the question of compulsion, the fact that the contract was made at sea, or under circumstances demanding immediate action, is an important consideration. If, when the contract is made, the price agreed to be paid appears to be just and reasonable, in view of the value of the property at stake, the danger from which it is to be rescued, the risk to the salvors and the salving property, the time and labor probably necessary to effect the salvage, and the contingency of losing all in case of failure, this sum ought not to be reduced by an unexpected success in accomplishing the work, unless the compensation for the work actually done be grossly exorbitant." The Elfrida, 172 U. S. 186, 197, 19 Sup. Ct. 146, 43 L. Ed. 413. Taking an excerpt from the same case (page 194, 172 U. S., page 148, 19 Sup. Ct., and page 416, 43 L. Ed.), as follows: "It may be said, in this connection, that the American and English courts are in entire accord in holding

that a contract which the master has been corruptly or recklessly induced to sign will be wholly disregarded,"—the learned proctor for the claimant contends that the reckless proffer of a contract is a better reason for disregarding his engagement than the reckless signing of such contract; and, further, that, from the apprehensions which the master felt in respect to the dynamite on board the Thornley, he was not in a proper frame of mind to make a contract imposing a serious burden upon his vessel, cargo, and owners. As we have already stated, the evidence in the record does not warrant the finding that, under the particular circumstances attendant upon the dynamite on board the Thornley, there was or was not any actual danger to the crew, salvors, or vessel. The apprehensions which the master felt and expressed appear to have been no more than the apprehensions that people not particularly informed as to the manufacture and explosiveness of dynamite feel in regard to the danger of explosion. In respect to such apprehensions, the master differed in no particular respect from the other people who had to deal with the cargo of the Thornley. The evidence in the record shows that in all matters concerning the cargo and preservation and interests of the Thornley, except, perhaps, in running her aground by keeping too far in shore, the master was particularly careful and attentive, and the result, in our minds, is that the master, during the whole time occupied in getting the Thornley afloat, was as fully advised and competent to take care of his own and his owners' interests as could be expected from shipmasters generally.

The suggestion of the proctor for claimants that the salvage contract does not bind the master nor the steamer to the full payment of $20,000, we take, as he says he makes it, seriously; but, seriously, we see no good reason for his making it.

The proctor's further contention, that, under the terms of the contract, the specified amount was only to be paid upon the vessel's being delivered safely in the port of Key West, and that the word "safely" should be construed to mean intact, without damage or deterioration, is not well founded. At the time the contract was made, the vessel was on a reef, where she had been run with great violence, and was thumping and pounding. To hold, in this state of the case, that the contracting parties had in mind that the ship should be salved in such perfectly sound condition as she was before she ran on the reef is to do violence to the common sense of the case. "Safely delivered" meant delivered in a safe place, with no impending dangers, the same as "safely arrived," "safely moored," "safely anchored." "Safely," in such connection, does not mean that the ship is intact, without injury or damage resulting from her voyage.

It is assigned as error in this appeal that the court below erred in treating the libel as though it declared upon a contract, and was seeking recovery for the amount named in the contract. The contract for salvage was made after the salvage services had been commenced, and somewhat proceeded with, and the libel contains a statement of the entire case. The relief prayed for was for payment of the sum of $20,000, the same sum named in the contract as reasonable and proper salvage. There were no exceptions filed to the libel.

It is not claimed there was any surprise or uncertainty. The answer expressly puts in issue the validity of the contract, asserting that the same was made under duress, and was out of all proportion to the value of the ship and cargo and the skill displayed, and the risk and danger of salvors.

In Dupont de Nemours v. Vance, 19 How. 162, 171, 15 L. Ed. 587, it is held:

"The rules of pleading in the admiralty are exceedingly simple and free from technical requirements. It is incumbent on the libelant to propound with distinctness the substantive facts on which he relies; to pray, either specially or generally, for the relief appropriate to them; and to ask for such process of the court as is suited to the action, whether in rem or in personam. It is incumbent on the respondent to answer distinctly each substantive fact alleged in the libel, either admitting or denying, or declaring his ignorance thereof, and to allege such other facts as he relies upon as a defense, either in part or in whole, to the case made by the libel. The proofs of each party must correspond substantially with his allegations, so as to prevent surprise. But there are no technical rules of variance or departure in pleading, like those in the common law, nor is the court precluded from granting the relief appropriate to the case appearing on the record, and prayed for by the libel, because that entire case is not distinctly stated in the libel. Thus, in cases of collision, it frequently occurs that the libel alleges fault of the claimant's vessel; the answer denies it, and alleges fault of the libelant's vessel. The court finds, on the proofs, that both were in fault, and apportions the damages."

The rules here declared seem to be particularly applicable to the case in hand. We notice that it is common practice in the admiralty, in suits brought to specifically recover on salvage contracts, and the facts are all brought out, for the court, on setting aside the contract for cause, to at once proceed, without amendment to the pleadings, to award proper compensation for services actually rendered. See Brooks v. The Adirondack (D. C.) 2 Fed. 387; The Young America (D. C.) 20 Fed. 926; The Elfrida, 41 U. S. App. 585, 23 C. C. A. 527, 77 Fed. 754; The Tornado, 109 U. S. 110, 3 Sup. Ct. 78, 27 L. Ed. 874. Reversing the rule, where all facts are before the court, can work no hardship.

The learned district judge of the court below, in disposing of this case, said, among other things, as follows:

"The one important question in this case is whether the agreement made by the master of the steamship Thornley with the salvor should be recognized as valid and binding upon the owners. The contention that the agreement or contract entered into was but a unilateral contract; that the one party was bound, but the other was not; that the salvors were bound to take the vessel off for $20,000, but that the master was not bound to pay that amount,—cannot be accepted. By the terms, the contracting parties were mutually bound; the master certainly bound to something, and, if to anything, it must be to a payment of the amount named. The defense that such agreement could not be considered binding, because the master had no opportunity to consult with his owners or underwriters, can have no weight. A master is a representative of the owners, and his contracts bind the property, whether made by their advice or not. The recognition of any other principle in the determination of admiralty liens would overthrow every established rule upon the subject. The supreme court, in the case of Post v. Jones, 19 How. 150, 15 L. Ed. 618, squarely declared that 'courts of admiralty will enforce contracts for salvage services and salvage compensation, where the salvor has not taken advantage of his power to make an unreasonable bargain'; and in the more recent case of The Elfrida, 19 Sup. Ct. 146, 43 L. Ed. 413, reaffirmed the doctrine therein laid down, approving the cases in which it had been recognized, and quoting from numerous of them.

Examining this case in the light of the rule declared in Post v. Jones, supra, can it be said that the salvors took any advantage of their power to make an unreasonable bargain? On the contrary, they expressed themselves willing to render any assistance in their power, regardless of any contract. There was no pressure brought to bear upon the master,—neither concealment, fraud, nor deceit of any kind. All the advice, aid, and assistance required was tendered. Nor was the amount so contracted for so exorbitant or extortionate as to demand an ignoring of the agreement. It may be, possibly, slightly larger than I should have given had no contract been made; but not only the supreme court, but the English courts, have frequently declared that, in the matter of a contract for salvage, the mere fact that it was a hard bargain will not justify setting it aside. The vessel was in a position of danger. It was impossible for the master to relieve her. Every hour she remained there was one, of peril. The locality was one of the most dangerous on a dangerous reef, where the records of this court show that vessels have gone to pieces more than once, and the service rendered by the salvors the only assistance available. The work was well done, with as good dispatch as possible under the circumstances, and the property relieved without loss or damage, except the small value of the coal jettisoned. The number of men rendered necessary on account of the character of the work, and the importance of its being continued without remission, gives personally no more than an ordinary salvage reward. A comparison with the numerous cases cited in the Elfrida, as well as with that case itself, will show that the amount of the contract was not so unreasonable as to demand that it be set aside on that account."

In this we concur, and on the whole case we are clear that the decree of the district court should be affirmed, with costs; and it is so ordered.