## THE PENOBSCOT.

(District Court, E. D. North Carolina. July 7, 1900.)

SALVAGE—AMOUNT OF AWARD.

The Penobscot, a schooner, valued, with her cargo, at $11,750, was on a shoal at the mouth of the Cape Fear river, where she had been for two hours in a position of imminent danger, the wind and tide driving her further ashore; and the testimony showed that, without assistance, she would undoubtedly have been lost. Her crew had hoisted a signal of distress, and were preparing to abandon her. There was no one near, able to render assistance, except libelant, who was owner and master of a passenger steamer worth $20,000 or $25,000, lying at a wharf within sight. Seeing the danger of the schooner and her signal, he landed his passengers and went to her relief, at considerable risk to his vessel and crew, and, after half an hour's work, succeeded in pulling her off the bar, and towed her to Wilmington. Held, that the services performed were not of a low order of merit, to be compensated by payment for the actual work done, but that libelant and his crew were entitled to a salvage award of $2,000.[1]

In Admiralty. Suit to recover for salvage services.

Geo. Rountree, for libelant.
Thos. Evans, for respondent.

PURNELL, District Judge. John W. Harper, master and owner of the steamer Wilmington, in behalf of himself and other officers and crew of said steamer files this libel against the schooner Penobscot, her tackle, cargo, etc., claiming $2,500 salvage. On the 3d day of February, 1900, libelant, with the steamer Wilmington, was lying at the wharf at Ft. Caswell, inside the bar and harbor, near the mouth of the Cape Fear river. The Wilmington is a passenger steamer of 200 horse power, 7 feet draft, carries a crew of 7, and

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

is worth $20,000 or $25,000. Seeing a schooner in or near the breakers, where he knew she ought not to be, from his familiarity with the coast after 25 years' service on this bar, with her flag in the rigging, union down, libelant put his passengers ashore, and went to the rescue of the schooner. The schooner was found to be on a sand shoal, head on, pounding heavily, leaking; flag in the rigging, union down; lifeboat in the water, oars adrift; sails down; some of crew's baggage on deck, and some in the small boat. The vessel was not in the breakers, but the breakers were under her bow. The tide was rising, and at that point the current was west. It was about 8 a. m. when the steamer reached the schooner, and high water about 11 a. m. The channel was to westward of schooner. The wind was blowing the schooner on shore. She was drawing 12 feet of water, and her bow was in about 9 feet of water. Wind was blowing 16 miles, W. S. W., and driving schooner onto shoal. Wind and tide were in the same direction, driving the schooner into shoalier water. Wind modified later, then freshened up again. Soon after the Wilmington reached the schooner the life-saving crew, attracted by the situation and signal in the rigging, came through the breakers and boarded the schooner. Among the life-saving crew, such expressions as, "There is one certainly doomed," "She will leave her bones on the beach," etc., were used. This crew could have saved the crew, but could not have saved the schooner. The schooner was in imminent and immediate peril of being driven ashore and wrecked. The U. S. Sandsucker, a steamer much larger than the Wilmington, was at work on the bar, in sight, but not within speaking distance. This steamer, being of 14-feet draft, could not go to the schooner. She did not attempt to do so, or to render any assistance. No other steamers appear to have been in sight. The schooner having all sails set, except gaff topsails and outer jib, struck, head on, in about 9 feet of water, on sand bar about 6 a. m. Centerboard struck first, and is presumed to have been bent, as no one has been able to raise it since. Sails were immediately lowered, and the flag set in the rigging, union down. There were two bow anchors and a kedge anchor aboard, but no attempt to cast either was made. There was much danger to the Wilmington in going to the schooner, under the circumstances. Any breakage in her machinery, or other accident by which the control of the boat was lost, would have, with the wind and tide as it was, caused her to have been driven into the breakers, beached, and wrecked. There was no contract. When the master of the schooner asked Harper what he would charge to pull her off, Harper replied, in substance, that it was not a matter of charge or contract; that, if he did not pull or get him off, there would be no charge. A line was then passed and made fast to the schooner's hawser, and the hawser hauled aboard the steamer. Taking advantage of the rise of the sea, the schooner was pulled off, after about half an hour's pulling, and afterwards towed up to the city of Wilmington. The schooner, her tackle, cargo, etc., are worth $11,750.

When witnesses on direct examination testify that the wind was not over 3 miles, as the master does, and on cross-examination

that it was. 12 miles, which is only one of many such discrepancies appearing in the depositions, their testimony does not inspire much confidence or carry conviction. Not being able to observe their manner on the stand, and other indications to courts and juries of the truth of their version of a controverted fact, the court can only draw its conclusions from the recorded testimony. After hearing the witnesses produced, and carefully examining and sifting the depositions, the court finds the foregoing, and no others, as the true and material facts in the case. Expressions of opinion by witnesses not shown to be experts are disregarded. The schooner's crew testify that there were no breakers on a sand bar at the mouth of Cape Fear river, on a flood tide, and wind 12 or 16 miles, in February. The witnesses examined say that there were breakers under the bow of the schooner. The court believes the latter. All the proof, including the testimony and record of the life-saving crew, required to be kept, sustains this conclusion. The depositions, on their face, are unreliable. The testimony of the witnesses examined carries conviction where there is a conflict. Their manner on the stand impressed the court that they were telling the truth.

The facts show salvage services,—that libelant is entitled to an award. This was not controverted at the hearing. Libelant claims $2,500. Claimants insist that $50 would be sufficient compensation. An award of salvage is not intended as mere compensation to the salvors for services rendered, except where the salvage service is of a very low grade or order. The coast of North Carolina is not the safest. In fact, one would subject himself to ridicule who expressed an opinion that it is not a dangerous coast. to even a well-informed schoolboy. It would not do to tell it to the marines. The sand bars such as the schooner was aground on are the principal cause of danger, and every seafaring man knows it. The Penobscot was on one of these shoals, where she had been for two hours; wind and tide driving her further ashore; no available assistance at hand or in sight. She was flying a signal of distress. Whatever may be thought might have been done, nothing was done to save her from pounding to pieces. Her crew were helpless to save, evidently preparing to abandon her to her fate; and the life-saving crew, having experience in such matters, freely predicted at the time, and in their testimony afterwards, that she was "doomed to leave her bones on the beach." The schooner was in imminent danger. The libelant, with 25 years' experience on that bar, having only a steamer of light draft (and no other could have reached the schooner in her perilous position), built for passenger service, with her decks and cabins high above the water line, worth twenty or twenty-five thousand dollars, at her wharf inside the harbor, seeing the schooner where she should not have been, and the signal of distress, put his passengers ashore, and, at great peril to himself, his steamer, and his crew, went out through the breakers to the schooner, and pulled her off the sand shoal. This is not salvage service of a low order, but a service which required experience, bravery, and good seamanship. It involved risk of both life and property. It was a service for which a court of admiralty

will make an award, not only of compensation for actual services, but for the danger encountered, and to encourage others to render like services under similar circumstances. Salvage services, rendered at risk to life and property, which result in saving a vessel and cargo from a position of imminent peril, cannot be considered of a low order, to be compensated by payment for actual labor expended. The Thornly, 39 C. C. A. 248, 98 Fed. 735. The absence of other assistance is an important element to be considered in determining the amount of a salvage award. The Boyne (D. C.) 98 Fed. 444; The Volage, Id. On the amount of award for salvage services, the authorities differ to such an extent that it may be said that there is no fixed rule; each case depending largely on the facts and circumstances of the case itself, in the sound judicial discretion of the judge sitting in admiralty,—the award being sometimes below a fair quantum meruit, and more frequently, seemingly, much above, that such services may be encouraged. In The Lamington, 30 C. C. A. 271, 86 Fed. 675, and Duff v. Merritt, Id., the opinion delivered by Lacombe, Judge, for the circuit court of appeals of the Second circuit, discussing the question, is followed by a long list of cases showing such awards to be frequently 50 per cent. and more, and often much less. Applying the rule, if it can be so designated, taking into consideration the value of the ship and cargo salved, the imminent peril in which both were, the absence of other assistance, the risk of life of steamer's crew, and property of libelant, the experience and seamanship required for the service rendered, in the exercise of a sound discretion $2,000 is adjudged a proper award; and this amount will be awarded the libelant, to be apportioned in equitable amounts to libelant, as master and owner of the salving steamer, Wilmington, and the crew of said steamer, as their interest and services may deserve. A decree will be drawn accordingly. It is so ordered.