### THE THOMAS L. JAMES.

(District Court, E. D. North Carolina. April 5, 1902.)

1. SALVAGE—RESCUE OF STRANDED SCHOONER—COMPENSATION.

The schooner Thomas L. James, loaded with lumber, was run ashore by the master "to save life" on the coast of North Carolina, during a storm, and stranded between two bars in a position of extreme peril. She was regarded by her master and mate as being in an almost hopeless condition. Her rudder and some sails were gone. She had 3 feet of water in her hold, and while she drew 13 feet as loaded there was but 10½ feet at the place of stranding at ordinary high water. Libelants, 10 in number, went on board, and there remained for 3 days, in a position of great peril, most of the crew being sick, and the master and mate having been taken off the first day. Libelants pumped out the vessel, and threw overboard the deck load, 122,000 feet, and with the assistance of others floated the schooner, and brought her into port with her remaining cargo. They also afterwards rafted and saved 40,000 feet of the lumber jettisoned, about 60,000 more being saved by others. The schooner and remaining cargo saved were of the value of $14,000. *Held*, that libelants' services were of a high order of merit, and the others assisting in the salvage not being before the court, and the amounts paid them not being shown, that libelants would be allowed for their services in salving the vessel and cargo on board $1,000; that they would further be allowed one-third the reasonable value of the lumber rafted and salved by them subsequently.[1]

2. SAME—VALUE OF SALVED CARGO—PRIVATE SALE BY OWNER OF VESSEL.

A sale of lumber jettisoned from a ship, and subsequently rafted and salved by others, by an agent of the ship, at private sale and without advertisement, does not fix its value for the purpose of determining the compensation to which the salvors are entitled.

In Admiralty. Suit to recover for salvage services.

W. D. McIver, for libelants.
A. D. Ward, for respondent and claimants.

PURNELL, District Judge. On December 25, 1899, D. H. Ward, J. M. Howland, Herman Kirkman, C. Kirkman, Lawrence Kirkman, A. W. Pittman, Ab. Bell, E. H. Heady, L. A. Seawell, R. L. Smith, Geo. W. Smith, and W. A. Prince filed a libel for salvage services against the schooner Thomas L. James, of Key Port, N. J., her tackle, apparel, furniture, and cargo, on board and ashore. On January 15, 1900, an answer was filed. By consent, on the 26th day of April, 1900, the case was referred to a commissioner to take the depositions of such witnesses as the parties might produce, and their examination in writing and on oath return to the court on or before the 15th day of July, 1900. By consent the cause was continued from time to time. The report of the commissioner was filed April 23, 1901, and the cause set down for hearing, and continued from time to time, until the final hearing was had, on the 21st day of March, 1902, both libelants and

---

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

respondent being represented by proctors. Upon such hearing and upon careful examination of the proofs filed the following appear and are held by the court to be the facts:

The schooner Thomas L. James, loaded with lumber, bound from Savannah, Ga., to Roundant, N. Y., was driven ashore and stranded on the new shoal near Bogue Inlet, N. C., on October 31, 1899. In the wreck report of the master, dated November 15, 1899, to the collector of customs, in stating the cause of the casualty he says: "Vessel filling. Run ashore to save life. Force of wind eighty miles an hour." The cargo consisted of 372,000 feet of lumber,—122,000 on deck and 250,000 in the hold. The deck load was mostly of heavy timbers, and the libelants threw off said deck load of lumber. It required seven, eight, and sometimes ten men to get one piece overboard. The ten libelants first named began work on Saturday, and remained aboard and by the vessel until and during Monday following, working the pumps, throwing overboard timbers upon each succeeding flood tide, and rafting the same between tides. Most of the crew were sick. Those who could assisted. The inflowing tide carried the lumber thrown overboard inside the banks, and down the adjacent sound waters, where, with boats, it was gathered together and floated to safe places on the mainland. Said first-named ten libelants rafted two rafts, containing about 40,000 feet of lumber, which they guided to safe harbor, and continued for 30 days thereafter to care for and watch. Libelants R. L. and Jas. Smith gathered together of the said cargo thrown overboard. and floating as aforesaid another raft of about 12,000 feet, and guarded the same until about the 30th day. A. W. Moore, W. W. Davis, and Elijah Kennedy were engaged two days in getting up the drifting lumber and cargo, and saved about 1,200 feet. The scow schooner Little Jim, Capt. Saloame and two men, also Oliver Willis, with a mate and sharpie, saved and salved of said lumber about 3,700 feet. One hundred thousand feet of the deck load was saved. When libelants, the ten first named, spoken of herein as the "ten," went aboard the vessel, the water was beating upon her decks. She was lying on the starboard side of the channel. There was from 2 to 6 feet of water on the starboard, and 7 to 11 on her port side, according to the tide. High seas striking her on the port side washed up on the deck load. There was about 3 feet of water in the hold when she struck on the bar. The rudder was gone, also one of her sails. There was one bar on the outside, and one bar on the inside, and the vessel was between them. There were breakers on the shoal. The tide at this point runs about 4 marine miles an hour. The vessel was drawing about 13 feet of water, and there was about 10½ feet of water in the channel at ordinary high tide. With strong breezes from the seaward, the vessel would have gone to pieces. She came in on an extraordinarily high tide, called a "storm tide." When libelants went to her the opinion was expressed by the captain and the mate that she had "broken her back on the reef, had knocked her bottom out," and when the pumps were tried by McGinn he was laughed at. No bargain was made with libelants. The captain directed them to throw the deck load overboard, saying they should be well paid,

and to look to the ship and cargo for compensation. The vessel was almost in a hopeless condition. She was on the reef just inside the point of the reef. She was drawing 13 or 13½ feet of water when the average tide was not over 10 or 10½ feet. She was down by the head, and listed aport on the sand, without protection by reason of being near the shore, and without sufficient water on ordinary high tide to have floated. Her condition seems to have been considered by both the captain and mate as desperate. She was in extreme peril, and there was great personal risk in saving the cargo and vessel. By the efforts of the first named ten libelants and others the vessel was lightened, floated, and towed within the harbor of Swansboro, where she was when libeled. The value of the property, ship, and cargo actually saved and located in Swansboro Harbor was $14,000,—ship, $10,000; cargo, $4,000. There is no evidence as to the amount of insurance on the ship or cargo. Evidence on this question is studiously avoided and guarded. Libelants are men of small means, and obtained advancements on their claims in this behalf from Geo. W. Smith and A. M. Prince, who say they bought the claims. There is no evidence of an assignment. There are allegations in the pleadings of an agreement to arbitrate the matters set forth in the libel, but it appears from the testimony that said agreement and alleged arbitration are for many reasons void, and of no effect, and this was conceded in the argument. There is also much testimony offered touching an alleged receipt executed by libelants, in possession of respondents but not produced, which simply serves to encumber the record, as it must have been known to proctors and is held by the court to be incompetent, and exceptions to all such testimony sustained. It cannot be considered. The receipt was not produced or proven to be lost. No proof is offered on this subject, but testimony tending to show its contents and purport was objected to on the hearing. Libelants have not been paid for services rendered in this behalf. Settlements have been made with other parties, which it is not necessary to consider in this connection, since the claim of the libelants is separate and distinct and unaffected by any contract others may have made by way of settlement. Such contract or settlement is good inter partes, but does not affect the claims of libelants. The only effect of such testimony and transactions would be as a guide to aid the court in arriving at a fair adjustment of the claims under consideration. Claimants ask to be allowed to pay libelants the amount heretofore tendered, being 25 per cent. of what they say is a reasonable valuation of the deck load salved, about $200. It is conceded in the pleadings and in the argument that the services rendered entitled the libelants to salvage; the gist of the contention being that it was not salvage services of a high order, and that 25 per cent. of the deck load saved and sold by claimants is reasonable compensation. McGinn filed a libel against the vessel and cargo in behalf of himself, his steamer (the Nannie B.), and crew, to which libelants were not parties. This libel was settled and withdrawn on the payment of $1,000. This proceeding is in no way binding on the libelants herein, and can in no way affect their claims. It is aliunde their rights. Some of the lumber saved was sold by T. M.

Thomas, but this sale was irregular, and cannot be considered as a test of the value of such lumber. He was the agent of the claimants.

The first argument pressed by proctor for respondents is that salvors cannot assign their claims for salvage, and if they do so the assignment does not carry with it the lien therefor. The authorities cited in the argument and brief all refer to seamen's wages, and in considering this question the supreme court in The Resolute, 168 U. S. 441, 18 Sup. Ct. 113, 42 L. Ed. 533, says: "A portion of the libelant's claim arises by assignment, and the authorities are almost equally divided upon the question whether such assignment carries the lien of the assignor to the assignee; obviously these are not jurisdictional questions." The district court, which allowed both the assignment and lien, was affirmed. The salvor ranks even seamen's wages incurred prior to the salvage services upon the general principle that it tends to the preservation of the res, without which the seamen themselves might lose their security. For the same reason it is superior in dignity to claims for materials and supplies or the cargo's claim for general average arising out of jettison on the voyage, when the vessel was subsequently wrecked. The admiralty guards with care all assignments or trades made with those of whose interests it has jurisdiction, for reasons which have been too often enumerated to require repetition, and will not permit hard bargains to be enforced against those who under stress or ignorance of the ways of those who may be found most ready to take advantage of their circumstances. Salvors are not always of the seaman class. Generally they are better versed in the ways of the landsman, and more crafty in business transactions. Their claims are highly favored. They are property possessing many of the incidents of choses in action, and there is no good reason why, by a properly drawn instrument in writing, a salvor should not be able to assign his claim and the lien which the law gives him therefor. Were this a question in the cause, the court would follow the decisions to this effect. But there was no assignment. Libelants obtained advancements, and even these will be protected when made in good faith. Courts of admiralty administer natural justice and equity.

It may be here remarked that the course of respondents, as shown in the depositions and in the pleadings, do not commend themselves to a court of admiralty, which does not countenance such hardships and tricks as seem to have been attempted on the libelants in this cause. The transactions as disclosed in the record seem to be a succession of attempts to impose hardships on the libelants which a court of admiralty will prevent when its jurisdiction is invoked.

Libelants are lumbermen, boatmen, fishermen, and sailors familiar with the coast, its tides, winds, and dangers, and the labor in which they were engaged. In that locality, "as uncertain as the wind" is full of meaning, and not a sentimental simile. That the wind did not veer to the east or southeast was fortunate for them, the ship, and the cargo. Had it done so all, at least much, would have been lost. It was a danger well understood, and, being so recognized, hard work was necessary. There was no complaint they did not do their full

duty, and no attempt to minimize the services rendered, until after the ship was safely moored in a snug harbor, and all danger had passed. Then there was much talk about what men could have been hired for by the day or hour and attempts to fix the compensation. But there were no other men at the wreck. The need of them was pressing, and the change of tone towards the ten men was an apt illustration of the familiar couplet of the sickness of his Satanic Majesty, when he would feign have assumed saintly ways, but upon restoration "devil of a saint was he." Salvage does not depend on contract,—springs from no duty. In the case at bar there was no contract. Under such circumstances it is based upon public policy. The salvor who rescues a ship or cargo from the grasp of the sea, wind, and wave need prove no bargain with the owner or master. He is paid by the court, not merely for the value of his time and labor in the special case, but a bounty in addition, that he may be encouraged to do the like again. "If the property of an individual on land be exposed to the greatest peril, and be saved by the voluntary exertions of any person whatever, if valuable goods be rescued from a house in flames, at the imminent hazard of life by the salvor, no remuneration in the shape of salvage is allowed. The act is highly meritorious, and the service as great as if rendered at sea, and yet the claim of salvage could not, perhaps, be supported. It is certainly not made. Let precisely the same service, at precisely the same hazard, be rendered at sea, and a very ample reward will be bestowed in the courts of justice." Marshall, C. J., in The Blaireau, 2 Cranch, 240, 2 L. Ed. 266.

Being founded on sound public policy, the admiralty ignores and disregards any unfair settlement, whether it be by contract or pretended arbitration. Dealings with salvors, as with seamen, to be upheld, must appear to be just, open, and equitable, and the burden of showing that they are so is on the representatives of the vessel or property saved, whether owners, insurers, or in any other capacity. The award is controlled by no general rule, but is governed by the circumstances of each particular case.

The services rendered by the first-named ten libelants, in operating the pumps to free the vessel in her precarious condition of the water in the hold, and throwing the deck load of lumber overboard, were services essentially to the ship, and for these services they are entitled primarily to a lien on the vessel and cargo aboard, and, secondarily, to a lien on the cargo thrown overboard. The pumping done after she was towed into port, and for which they were paid small amounts, was not, strictly speaking, a salvage service, but it was a service to the ship. Rafting the lumber flotsam and mooring in safety on the stage of the tide when work aboard ship could not be done, while it kept them constantly engaged, was strictly a salvage service rendered to the cargo, for which they have a lien on the lumber salved primarily. As to the first claim, the salvage services to the ship, it is difficult to make a per cent. or even an average allowance; for others were engaged who are not parties to this proceeding, and who have been paid and satisfied under another proceeding, of which the court knows nothing except incidentally. Were all such parties represented, the

court would be inclined to allow all at least 25, and possibly 33, per cent. of the property salved, the vessel and cargo on board. But this it will readily be seen would be impracticable, since master, owners, and other salvors have made settlements, and the latter are not before the court. The award must therefore, of necessity, be in a lump sum. Considering the condition of the vessel, stranded, and in the opinion of those most interested and best informed, the master and mate, a hopeless wreck, on the beach, without sufficient water to float her, rudder gone, some of the sails gone, her bottom knocked out, "back broken," the crew sick and worn out from labors in a gale through which they had passed, and by which they had been forced to make land "to save life," on a sparsely settled coast, with shifting sandbars, there to-day and gone to-morrow, in a position where an easterly or southeasterly wind would cause her destruction; considering the property saved by the efforts of the salvors,—all of them,—a third of the value of the property saved would not be excessive as a reward for salvage services rendered under such circumstances. Was there no danger to the ten who remained aboard, working day and night, as the waves and wind permitted? It is in evidence that to fall overboard was to be drowned. In the event of an adverse wind, there was no way for the salvors to get ashore. The master and mate were taken off by the steamer Nannie B. the first day, and the evidence does not show when either returned, or, if they returned, how long they remained. It is not creditable to parties whose property has been saved from such dangers to belittle the services of those who would "lend a hand,"—risk the dangers,—when the master and his mate seemed to be without hope. If nothing was saved, the salvors got nothing. They assumed the risk, faced the dangers, and should be rewarded accordingly. Their services were as valuable and effective and attended with more danger to themselves than those rendered by Capt. McGinn and his crew of the steamer Nannie B., who could go into port at night or in case of storm or as occasion required. True, had this claim been involved, the value of the steamer and other facts would have been considered, as in The Penobscot (D. C.) 103 Fed. 205; Id., 45 C. C. A. 372, 106 Fed. 419; but it is not involved in this proceeding. By settlement, this steamer and crew were paid $1,000. Why not at least this amount to the salvors?

Considering all the circumstances above recited, the value of the property salved, the dangers attendant thereon, and the meritorious services rendered by the ten salvors first named in the libel, D. H. Ward, J. M. Howland, Herman Kirkman, C. Kirkman, Lawrence Kirkman, A. W. Pittman, Ab. Bell, E. H. Heady, L. A. Seawell, and R. L. Smith, it is considered, ordered, and adjudged that they be and are hereby allowed $1,000, or $100 each, for salvage services rendered the schooner Thomas L. James, and the cargo aboard, in the hold, and saved. The service in rafting and watching the lumber, as has been said, is not salvage of as high order as that rendered the ship. A part of this service was rendered during the time, and enters into the award hereinafter made; but after the said salvage services were rendered the ten salvors were engaged for 30 days in rafting, mooring, and

watching the lumber. In this way they saved 40,000 feet. This lumber was sold by an employé of the vessel or the owners thereof,— a man whose name appears on respondents' stipulation. As said by proctor for libelants referring to the pretended arbitration, it was a sale "by the boat and for the boat." It can therefore furnish no test as to the value of the said lumber. It is in evidence that the lumber salved was or would have been worth $25 in New York, and the freight is $6 per 1,000, and there are always sailing vessels ready to take a cargo to New York. The freight would have been less, possibly the market not so good, at Norfolk, Va., or Baltimore, Md. And there is a market at New Bern or Elizabeth City, in this district, for lumber, the voyage to either of which ports is safe, being by inland waterways, as it is to Norfolk. Large quantities of lumber are shipped from both ports. There is no evidence of the price of this grade of lumber at either port, except New York; but taking this as a basis, and allowing a liberal discount for handling and freight, $12 per 1,000 should be about the price of such lumber at Swansboro. One hundred thousand feet of the deck load is admitted to have been sold for $938. This sale, as has been seen, was no test. It was without advertisement or other incidents of a fair sale. A fair compensation should be allowed for this service on 100,000 feet saved, at $12 per 1,000 feet, $1,200. One third of this sum, $400, libelants should be allowed, and is hereby fixed as the compensation of all those engaged in the service of saving the lumber adrift. Many so engaged are not parties to the libel, some have been paid, and of others the court has no information, and can deal only with claimants who are parties. The ten saved and salved 40,000 feet of lumber, and are hereby adjudged to be entitled to $160 for such services, or $4 per 1,000.

It is agreed R. L. Smith and Jas. Smith, mentioned in the depositions, mean the same person, R. L. Smith, libelant. It appears, not clearly, but sufficiently so, that this libelant saved and salved 12,000 feet of lumber, and upon the basis established would be entitled to $48 salvage. Moore and Davis saved and salved 1,200 feet, and the crews of the Little Jim and the sharpie Nellie Bly saved and salved 3,700 feet, of said lumber, and are entitled to $14.80 salvage. The last named, Moore and Davis, and the crews of the two boats, are not parties to the libel, but it appears libelants G. W. Smith and A. M. Prince "bought out" the interest of these parties in the salved lumber after 30 days, and continued for some time to watch and care for it. This would give them a joint interest in the lumber; but, as before said, there was no legal assignment of the interests. To collect the amounts herein adjudged to be due these parties, it would be necessary to make them parties to the proceeding pro forma, and then for them to receipt for the same, or other parties do so under a formal power of attorney authorizing the collection and receipt. The same claim is made by G. W. Smith and A. M. Prince as to the interest of the ten libelants in the lumber, and the same course must be pursued in regard thereto; but the ten are parties. Smith and Prince will be reimbursed out of the allowance for salvage with a liberal bonus for the advancement, but cannot collect said amount, except jointly

with the ten libelants. The fractional division, which would, for a proper solution, require the abstract rules of algebra and differential calculus, and be as unintelligible to any of the parties concerned as calculations for tides and eclipses of the planets, the court does not propose to attempt. It has no place in the admiralty, as it would only serve, which has already been sufficiently done, to further "muddy the waters." To find one unknown quantity frequently puzzles the brain, but in this cause there are several unknown quantities.

It is therefore now ordered, adjudged, and decreed that the sum of $1,000, $100 each, be, and the same is hereby, awarded the ten first-named libelants, D. H. Ward, J. M. Howland, Herman Kirkman, C. Kirkman, Lawrence Kirkman, A. W. Pittman, Ab. Bell, E. H. Heady, L. A. Seawell, and R. L. Smith, for services rendered the schooner Thomas L. James, and the cargo on board between-decks. It is further ordered, adjudged, and decreed that the sum of $160 be, and the same is hereby, awarded the said ten libelants for salvage services rendered in saving the lumber thrown overboard. It is further ordered, adjudged, and decreed that the sum of $48 be, and the same is hereby, awarded the said R. L. Smith for salvage services rendered in saving the lumber thrown overboard. It is further ordered, adjudged, and decreed that the sum of $19.60 be, and the same is hereby, allowed to Moore and Davis and the crew of the Little Jim and Nellie Bly, as set forth in the opinion, said amounts to be paid, as set forth, to G. W. Smith and A. M. Prince, upon their filing a power of attorney, as set out. It is further ordered, adjudged, and decreed that claimants (respondents) pay the cost of this proceeding, including the commissioner's bill of $171.15, for taking and reporting the depositions herein. It is further ordered that judgment be entered against the respondents (claimants) and the sureties on the stipulation, in accordance with this decree, for the sums hereinbefore mentioned, and in favor of the several parties named.