## THE ROSEDALE.

## THE OREGON.

### (District Court, S. D. New York. March 28, 1898.)

1. COLLISION—SIGNALS NOT NOTICED—SIGNALS OMITTED — ROUNDING OUT OF SLIP.

The ferryboat O. rounding out of her slip at Broadway, Williamsburg, and going up the East river against the ebb tide, came in collision at a small angle in about mid river off S. Fifth street, with the passenger steamer R. coming down at 12 to 13 knots speed. The R. when about 600 yards away gave one whistle and ported. The O. did not hear that signal and gave no whistle until too late; she claimed that the R. was so close to the Brooklyn shore that the O. was obliged to go to the left, but the contrary was found upon the evidence. Held, that the O. was in fault; (1) for lack of lookout and attention to the R.'s signal; (2) for giving no signal, if she designed to cross the R.'s bow, which was on the O.'s starboard hand; (3) for not rounding to pass to the right of mid river as she

might easily have done, the courses of the two vessels as she rounded, coming about head and head. *Held*, also, that the R. was justified in counting upon that navigation by the O., in the absence of any signal to the contrary, but that the R. was to blame for her speed above the statute limit of 10 knots, and that the damages should be divided.

2. DAMAGES—PERSONAL INJURIES—NERVOUS SHOCK—CARGO—HARTER ACT.
   Claims for injuries to passengers or for loss of baggage are not within the third section of the Harter act; and for loss of cargo, the exemption of one vessel from paying her share, in case of mutual fault, does not increase the liability of the other vessel.

Carpenter & Park, for the Rosedale.

Wilcox, Adams & Green, for the Oregon.

W. W. Culver, Dudley R. Horton, M. A. Lesser, and I. A. Ourwitch, for creditors.

BROWN, District Judge. The above petitions to limit liability grow out of a collision which occurred in the East river off South Fifth street, Williamsburg, at about 11:30 a. m. on September 3, 1896, between the steam, passenger and freight boat Rosedale, plying between New York and Bridgeport, Conn., and the ferryboat Oregon, plying from the foot of Broadway, Williamsburg, to Twenty-Third street in the East river, N. Y. By the collision the Rosedale was sunk; the Oregon was damaged; and claims to personal injuries, and also for loss of goods on the Rosedale, have been interposed.

At the time of the collision the tide was at the last of the ebb and weak. The Rosedale was coming down the East river, and as her officers allege, about in the center of the river. The Oregon's witnesses say she was close over to the Brooklyn shore. When off about South First street, the Oregon was seen just leaving her slip at Broadway and rounding to come up her usual course in about mid river. The Oregon was then about 600 yards below the Rosedale, and as the officers of the latter say, about a point on their port bow. In a few seconds the Rosedale gave her a signal of one whistle, to which no answer was received, nor was any signal given by the Oregon at any time until alarm signals shortly before the collision, too late to be of any service. Shortly after signaling, the Rosedale ported her wheel slightly, so as to change her head about half a point more to starboard; and soon after, receiving no answer from the Oregon, she slowed. When about 150 to 200 yards apart, both vessels sounded an alarm and gave the order to reverse. They came in collision in about mid river, the Oregon striking with her port bow the port side of the Rosedale about 20 feet from her stem; neither vessel, as I find, being stopped at the time of collision. The angle of collision is not definitely fixed, but was probably small. It would be at once increased, because both boats were immediately turned to the westward by the force of the collision, and that would naturally give the impression of a larger angle at the moment of contact.

The East river at the place of collision is from 1,600 to 1,800 feet wide. For the Oregon it is claimed that the speed of the Rosedale was at the rate of from 14 to 15 knots, instead of only 10 knots, the

limit prescribed by statute; that when the Rosedale was first seen off South First street, she was not more than from 300 to 400 feet off the Brooklyn shore, and heading about straight down river, and that she was therefore wholly out of the way and to the eastward of the usual course of the Oregon, so that the Oregon did not need to give her any further attention, and that the Oregon was occupied in avoiding a tug and tow that were coming up a little to the westward of the center of the river; that it was the duty of the Rosedale to keep along the Brooklyn shore; and that the collision was brought about solely by the fault of the Rosedale in her excessive speed and change of course of at least two or three points to starboard.

1. There is great contradiction in the testimony as to the place of the Rosedale in the river. Several of the witnesses for the Oregon are inconsistent in their different statements; others now testify differently from their statements before the local inspectors. The usual course of the Rosedale was down the middle of the river. No reason appears why she should have departed materially from that course upon this trip. There were no other vessels in the way; and in or near the middle of the river she had a more favorable tide at the last of the ebb than she would have had near the shore where it would be slacker. Her own officers could best know and judge of her position; and their testimony that she was in about mid river is substantiated by much other independent testimony. After porting half a point, she went not more than 800 feet to the place of collision, and this would give only about 80 feet westing to mid river where the collision occurred. My conclusion on this point, notwithstanding the opposite testimony, is that when she signaled the Rosedale was but little nearer to the Brooklyn shore than to the New York shore, and was not materially out of mid river.

In the slack ebb, the ferryboat would naturally be expected to go up in about mid river, and at this time necessarily so, as the tug Anthracite with her tow was but little on the New York side of mid river and opposite the ferryboat, so as to prevent her from crossing beyond mid river. As the ferryboat rounded up the river she and the Rosedale would have come "nearly head and head," i. e. so as to show each other, if it were night, their two colored lights. It was the duty of each, therefore, to go to starboard under a port wheel, as when rounding a bend in a tortuous stream. The John S. Darcy, 29 Fed. 644, 647, affirmed in 38 Fed. 619. The Rosedale navigated in accordance with this rule, giving, as was her duty, a signal of one whistle. Had the ferryboat observed the rule and done likewise, no collision would have ensued. Nothing was in the way of the ferryboat to prevent her from observing it and going to the right. She came out of the slip with her helm only half over to port; not for a considerable time afterwards, nor until collision was imminent, did she put it hard a-port. As she was heading about straight up river at the time of collision, the result leaves no doubt that had she ported more when the Rosedale was first seen, or when the latter gave her a signal of one whistle, she would have passed well clear of the Rosedale, port to port, as the rule required.

2. On coming out of her slip, the Oregon had the Rosedale on her starboard hand. The Rosedale was less than a third of a mile away and on a crossing course. It was, therefore, the Oregon's duty to keep away from the Rosedale, and under the circumstances to do this by going to the right, as that course was practicable, easy and safe, while crossing her bows was at best dangerous. In any event, had she designed to cross the Rosedale's bows, it "was her imperative duty," as stated by the court of appeals in the case of The Albany, 81 Fed. 966, 971, "to signal such intention by a two-blast signal and obtain assent to it." Had such a signal been given, the collision no doubt would have been avoided.

This collision in my judgment is primarily attributable to the fault of the Oregon, first, in having no lookout properly attending to his duties, and the inattention to the Rosedale, or to her signal of one whistle; second, to the pilot's inattention or perhaps ignorance of the rules of navigation, in apparently supposing he had the right of way; thirdly, to the pilot's failure to give a signal of two whistles to the Rosedale, when he meant to cross her bows. The position of the Anthracite was no real embarrassment to the ferryboat, and furnishes no excuse for her pilot's inattention to the Rosedale and her signal; since the tug and tow did not require his wheel to be more than halfway to port, as usual, in rounding up river. Had he properly attended to the Rosedale, or observed the ordinary rules of navigation, his duty was plain and easy,—either to put his helm hard over and go to the right, as he could have done without stopping, or to have stopped until the Rosedale had passed. The slight porting of the Rosedale, instead of interfering with the performance of this duty, facilitated it. The Rosedale, receiving no signal of two whistles from the Oregon, had the right to assume that the Oregon would keep to starboard.

3. The Rosedale had no lookout forward. But it is plain that the Oregon was seasonably observed from her pilot house, and that a lookout forward would have added nothing to the observation and knowledge of the officers, for the purpose of avoiding collision. The absence of a lookout forward was, therefore, immaterial.

I think the evidence shows, however, that the Rosedale was in fault for excessive speed beyond the statute limit of 10 knots. There is much outside testimony to her rapid movement, while the evidence of her officers, in this regard, is necessarily uncertain,.and the direct testimony as to her revolutions leaves no doubt in my mind that she was making from 12 to 13 knots (besides the tideway) when the ferryboat was first seen. In several ways this clearly contributed to the collision, and I must, therefore, hold her also to blame.

4. The claim of damages for personal injuries in behalf of Mrs. Tilden, presents a very difficult question. By the collision she was thrown against a chair. She showed no injury at the time. It is claimed that she subsequently became incapacitated to perform her household duties from this cause, and still remains so. She called no physician until some nine days after the accident, and since then has been more or less under medical treatment. Her complaints, though seemingly genuine and attended with undoubted suffering, are not

wholly explicable. The most skillful examination finds some spinal irritability, with such discomforts as attend that condition. The case seems to belong to the class of nervous shock occasioned by the circumstances of the collision. She is slowly improving. There is great diversity of opinion, even in the medical profession, as regards the extent of the incapacity of persons suffering from these nervous disturbances. On the whole evidence I conclude to allow to her the sum of $1,250; and to her husband the sum of $250.

5. A claim has been interposed by Gross & Co., now represented by their assignee, for the loss of a case of clothing shipped as merchandise at Bridgeport on the Rosedale, consigned to Catskill, and to be transported by the Rosedale to New York as a part of her cargo. As respects the liability of the Rosedale for this loss, I must hold the claim barred by the third section of the Harter act (Act Feb. 13, 1893; 27 Stat. 445; 2 Supp. Rev. St. p. 81), since the fault by which the loss occurred, so far as the Rosedale is involved, was a fault in the "navigation or management of the ship." It is suggested that the lack of a lookout forward was a lack in "manning or equipping" the vessel, for which the owners are responsible. I have found, however, that the absence of a lookout forward on the Rosedale was not in this case a contributing cause of the collision, and therefore was not the cause of the damage. But aside from this, there is no evidence or presumption that the vessel was not properly manned and equipped. The evidence is to the contrary. Whether a lookout is stationed forward or not, when the ship has a competent crew, as she did have in this case, depends wholly upon the management or direction of the officers; in other words, it is a part of the "management of the ship," for which the owners are not responsible to the shippers of cargo. Under the law as it existed prior to the passage of the Harter act, in cases of collision by the common fault of two vessels, where each is required to pay half the damage, it has been adjudged by this court that the third section of the Harter act, in relieving the carrier vessel and her owners from responsibility for their half of the damage to cargo, was not designed to increase thereby the damage payable in such cases by the other vessel. The Viola, 60 Fed. 296; The Niagara, 77 Fed. 329, 335. The claim for the case of goods, therefore, can be proved to the extent of one-half the damage against the Oregon; but it must be disallowed as against the Rosedale.

6. Injuries to passengers, and claims for loss or damage to their personal baggage, not shipped as merchandise and not paying freight, are not in my judgment within the exemptions of the first clause of the third section of the Harter act. These claims, therefore, can be proved against both vessels. The claim for loss of baggage will be referred back to the commissioner to ascertain the amount, if not admitted.

Decree accordingly.