## THE HUMAROCK.

(District Court, S. D. Georgia. May 13, 1916.)

1. SALVAGE ⬤⟿36—CONTRACT FOR SALVAGE SERVICE—VALIDITY.

A contract between the master and part owner of a schooner, which had been rescued from a stranding and brought into port in a leaking condition, and the salvor, for the services of a tug at $10 per hour to stand by and pump until the schooner was unloaded, which service continued for 6½ days, where the contract was not made under duress, but in a port where the master could have obtained other assistance, *held* not so unreasonable as to justify its being held invalid; the value of the tug being $30,000, and the cost of its operation during the pumping $100 or more per day. Such contract, however, *held* not binding on the cargo owner, who was accessible, but was not consulted.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 85–91; Dec. Dig. ⬤⟿36.]

2. SALVAGE ⬤⟿30—AMOUNT OF COMPENSATION—RESCUE OF STRANDED VESSEL.

The services rendered by the salvor prior to the making of the pumping contract consisted in pulling the schooner from a quicksand reef near the mouth of Savannah river, on which she was stranded and in serious danger, and bringing her into port. In this service two tugs, worth $60,000, were employed for 4 hours, during which it was also necessary to keep her pumped to prevent sinking. Both vessel and cargo were saved without loss; but the service was not dangerous. *Held*, that the salvor was entitled, in addition to the contract price for pumping, to an award of 10 per cent. of the net price realized from the sale of vessel and cargo.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74; Dec. Dig. ⬤⟿30.]

3. SHIPPING ⬤⟿133—INJURY TO CARGO—LIEN.

The owner of a cargo has a maritime lien on the ship for any damages sustained by the cargo, after it is delivered on board, through the fault of the vessel or master.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 488; Dec. Dig. ⬤⟿133.]

4. SHIPPING ⬤⟿137—LIABILITY FOR INJURY TO CARGO—HARTER ACT.

Under Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (Comp. St. 1913, § 8031), which provides that, if the owner has exercised due diligence to make a vessel seaworthy, and properly manned, equipped, and supplied, neither the vessel nor owner shall be liable for damage to the cargo resulting from faults or errors in navigation or in the management of the vessel, where a vessel was stranded through an error in navigation, evidence that the master had been in charge of vessels making the same port for 10 years, and was familiar with the waters, and could go in or out over the bar in daytime, is sufficient to show his competency prima facie, and to exempt the general owners and vessel, where she was otherwise seaworthy and properly manned, equipped, and supplied, from liability for damage to the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬤⟿137.]

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5.** SHIPPING ⬅136—LIABILITY FOR INJURY TO CARGO—HARTER ACT.

Where, in such case, however, the master, through whose negligence or error the stranding occurred, was a part owner of the vessel, the Harter Act does not exempt his interest from liability.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬅136.]

In Admiralty. Suit for salvage by the Propeller Towboat Company against the schooner Humarock, with intervening libel by the Hirsch Lumber Company, owner of the cargo, against the Humarock. Decree for libelant, and in part for intervening libelant.

The Humarock, a three-masted schooner of 500 tons burden, left Savannah about 11 o'clock a. m. on Friday, April 16, 1915, loaded with a cargo of over 327,000 feet of yellow pine lumber, alleged to be of the value of $5,000, shipped by the Hirsch Lumber Company, and consigned to the same company at New York. The schooner was towed down the Savannah river by the tugboat Cynthia No. 2, belonging to the Propeller Towboat Company of Savannah, Ga., the schooner having on board a licensed pilot; and when it reached a point in Tybee Roads, near the mouth of the Savannah river and nearly opposite the Tybee Light, its master, Capt. Foxwell, brought it to anchor, because he did not want to proceed to sea on his trip to New York against the adverse wind which was then prevailing. The tugboat was discharged when the schooner cast anchor, and it was the intention of the master to proceed to sea on the next morning if the wind was favorable. As to what happened between the master of the schooner and the pilot when the schooner was anchored there is some conflict of evidence. The pilot, Daniels, testified that the master of the schooner bade him and the master of the tugboat good-bye, and wished the captain a pleasant voyage; that the schooner was anchored in a safe place, and a place where ships are customarily anchored, in plenty of water; that the master was to put up a signal the next morning, the letter P, if he wanted a pilot, but that the next morning he looked and did not see such a signal; that he gave Capt. Foxwell particular directions as to how to steer the schooner out to sea, and that Capt. Foxwell replied, "Daniels, I know the way out as well as you do;" that the master said if the weather was favorable he would go out to sea the next morning without a pilot, and that he would put up the flag if he needed a pilot; that frequently vessels went in and out from Tybee without the assistance of a pilot; that he (the pilot) on the next morning was on the pilot boat, which was anchored at the bar about six miles away from the schooner, and could see the hull of the schooner and its sails but could not see any flag; and it was the pilot's opinion that no flag was put up. The pilot denied that he told the master to get his vessel under way the next morning and to proceed down the river, and that as soon as he, the pilot, saw the sails he would come to the schooner.

The master testified that the pilot, before leaving the schooner, after it was anchored, said to him: "If the wind and weather are favorable to-morrow morning, and you decide to go to sea, it will be high water at 8 or 8:30. Get your sails up, and start the schooner along down by the row of black buoys, keeping them on your starboard side, and I will meet you when I see your sails up." The master replied: "Pilot, don't forget what you are talking about, because I am not too well acquainted here; be sure and meet me over at that buoy." The pilot replied: "Don't worry about that; we will meet you if the weather is right; we will take you out to sea clear of the sea buoy." To which the master replied, "All right." The master further testified that the next morning he broke anchor at about 8:30, and before getting under way he hoisted "the American," the flag signal for the pilot, at the foretop masthead, and that as the weather was good and the wind had changed, and was from the west-southwest, he proceeded on down the river by the buoys, and that when the schooner got to the second black buoy it began to get calm, and then the wind gave out entirely. He thereupon at about 9:30 or 10 o'clock anchored, and lay in that position about three-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

quarters of an hour, when he felt the vessel touch the bottom, and soon after that the vessel was stranded on ebbing tide. He then put up the American ensign upside down as a signal of distress, and sent his mate and three men in the schooner's boat out for assistance. This boat went towards the pilot boat, which was anchored off the bar towards the ocean. In going out to the pilot boat, the schooner's boat met the tug Jacob Paulsen, which belonged to the Propeller Towboat Company, and thereupon the tugboat went to the assistance of the stranded schooner, reaching the schooner about 1:30 p. m. April 17th.

The schooner was stranded on what was known as "North Breaker," which lies to the northeast of the main channel of the Savannah river at a point about midway between the buoys known as C–9 and C–7, and which point is known by the pilots of the Savannah harbor as the "Eleven-Foot Lump," about 2½ miles from the point where the schooner was anchored the afternoon before. The schooner drew 16 feet of water, and the breaker at low water is only 10 to 13 feet. The evidence discloses that this North Breaker is a dangerous and exposed shoal, being composed of sand of the same quality as that at Bloody Point, Gaskins Bank, and other shoals in the vicinity of Savannah, which shoals are of a quicksand quality, and the tendency of vessels which are stranded on the same is to continue to sink lower and lower until they sink out of sight.

When the tugboat Paulsen found the schooner, there was a considerable swell running on the bank, and the schooner was pounding heavily, and a part of her keel was floating in the water, and the point of the anchor had broken a hole into the bottom of the vessel, and it was filling rapidly. The garboard strake, which runs along the ship, was also open, and the water streamed into the vessel through this also. The surface of North Breaker at this place is very uneven, irregular, and lumpy. The schooner was in a perilous position, and would undoubtedly have pounded to pieces and sunk without assistance. It could not have gotten off without assistance. The master had put all of his personal effects in a small boat. The schooner, besides being loaded with a cargo of lumber, had 100 tons of copper ore as ballast. According to the evidence it is clear that her position was one of great peril, and that in a short time she would have gone to pieces, if assistance had not arrived in the nick of time.

The tugboat Paulsen devoted about two hours pulling on the schooner in an effort to get her off the breaker, and the schooner's hawser parted two or three times during the pulling. As the tug did not seem to be making any headway in extricating the schooner from its dangerous position, the captain of the tug went to Tybee and telephoned to the Propeller Towboat Company's office in Savannah, asking for assistance. He then returned to the schooner, reaching her about 4 o'clock p. m., and began pulling on her again, and finally succeeded in getting her off into deep water. The tugboat Cynthia No. 2, which had been cruising out in the ocean, came by at that time, and as the schooner was rapidly filling with water, having about 8 feet of water in her hold, the master of the schooner requested the tugboat Cynthia to pump the water out of the schooner with her wrecking pumps. Thereupon the Cynthia was lashed to the side of the schooner and her pumps put to work. The tugboat Paulsen then towed the schooner up the Savannah river, and she was docked at the Municipal Dock about 8 o'clock at night. In response to the telephone message sent by the captain of the Paulsen to the Propeller Towboat Company, Capt. Van B. Avery, the general manager of the Propeller Towboat Company, hastened down the Savannah river in the tug Cambria, and met the other two tugs and the schooner coming up the river about the Quarantine Station. Thereupon Capt. Avery went on board the schooner, and advised with the captain of the schooner as to what was the best disposition to be made of the schooner. The master inquired as to the advisability of putting the schooner on the mud flats in the Savannah river, but Capt. Avery said this would be throwing her and the cargo away, and it was upon his advice that she was anchored at the Municipal Dock in Savannah. There were about 7 or 8 feet of water in the schooner, and she was filling rapidly all the time, at the rate of 6 feet per hour. Therefore Capt. Avery ordered the tug Cynthia to continue pumping the schooner during Saturday evening

and that night. Capt. Avery advised the master of the schooner to get in communication with the owners of the cargo, and he called up Mr. A. L. Farie, who was the representative of certain underwriters in Savannah, and Capt. Foxwell talked with him over the phone, and it was agreed that the proper thing to do was to keep her pumped out that night. Capt. Avery was asked what it would cost for pumping, and he told them his charge would be $20 an hour. The next morning Capt. Avery came down, and he, Capt. Foxwell. and Mr. Farie discussed the matter of pumping, and Capt. Avery thereupon agreed to reduce the charge to $10 an hour on account of the length of time it would take; the same to be continued until the schooner's pumps were able to keep the water down. This pumping was continued for 6½ days, or 156 hours.

The Propeller Towboat Company thereafter libeled the schooner Humarock and its cargo for salvage for its services in rescuing it from North Breaker, and keeping it afloat at the Municipal Dock by pumping the water out, as above stated. The Hirsch Lumber Company also libeled the schooner for damages sustained by it to its cargo of lumber and for any salvage that might be awarded against the cargo in the case, claiming that the master of the schooner was incompetent, and that the ship owners were negligent in the matter of the stranding. Various intervening libels were also filed in behalf of supply men and others who furnished materials and made advances to the Humarock. Neither the charter party nor bill of lading contained any general average agreement or any limitation affecting the liability of the vessel.

Capt. Foxwell, the master of the Humarock, was the owner of $24/64$, or ⅜, interest in the Humarock. He filed his claim to the same, and claims were also filed by the owners of the remaining interests. The holder of a mortgage for $600 on Capt. Foxwell's interest in the schooner also intervened. Under an order of the court the schooner and the cargo were duly sold at public outcry by the United States marshal. The schooner and appurtenances brought $4,401, and the cargo of lumber $2,128.15. The cost bill of the marshal for expenses of caring for the schooner, making the sale, etc., including $52 extra compensation for him for the 26 days he had it in charge, amounted to $520.08, and the bill of the Paulsen Company for discharging the cargo was $522.30.

Capt. Foxwell also filed an intervention for $415.15 for pilotage fees, towage fees, harbor master's fee, and for loading the cargo, which he claimed should be paid before any other interventions, except the salvage claim, and also an intervention for $16.86 for certain ship's expenses.

By an order of the court all the libels and interventions were consolidated, and the matter was duly heard by the court, and argument had for all parties and interests.

A. Minis, of Savannah, Ga., for Propeller Towboat Co.

Huger, Wilbur & Guerard, of Charleston, S. C., for owner of cargo.

Lawton & Cunningham, of Savannah, Ga., for owners of five-eighths interest in the Humarock.

W. R. Hewlett, of Savannah, Ga., for master and owner of three-eighths interest in the Humarock.

LAMBDIN, District Judge (after stating the facts as above). The court finds that the facts in the case are as set out in the foregoing statement which was prepared by it.

1. The first question is as to the amount that should be awarded as salvage to the Propeller Towboat Company for the services of its tugboat Paulsen and crew in rescuing the schooner from its perilous position on the North Breaker, and towing it to the Municipal Dock in Savannah, and for the services of its tugboat Cynthia in pumping the water out of the schooner up to the time it was anchored at the Municipal Dock, and also for the continuous services of its tugboat

McCauley, which lay by the schooner and continued to pump water out of its hold for 6½ days, or 156 hours, night and day.

[1] The cargo owners and the ship owners contend that the alleged contract for pumping at the rate of $10 per hour was not established, and further that it was exorbitant, excessive, and inequitable, and made after the services were begun and while the schooner was in the possession of the libelant, and was therefore made under circumstances which rendered the contract null and void. Capt. Foxwell, the master of the schooner, in his answer denied that such a contract was made, but, when placed on the stand as a witness in the trial of the case, stated that this denial in his answer was a mistake, and admitted that he did make the contract with Capt. Avery, the manager of the Propeller Towboat Company, for pumping the schooner Humarock, at the rate of $10 per hour. It is evident that he deceived his counsel in the preparation of his answer on this point. Capt. Avery testifies positively to the making of such a contract, stating that the contract was first made at $20 an hour, and that afterwards, realizing that several days would be consumed in pumping the schooner and thus keeping it afloat, he reduced the price to $10 an hour, which was agreed to by Capt. Foxwell. Mr. Farie, who represented certain underwriters in Savannah, was present during a portion of this conversation, and while he denied that he represented the cargo at the time, or had any authority to bind the cargo owner, he admitted hearing Capt. Avery state to Mr. Foxwell that the price would be $10 per hour. The court is of the opinion that the contract was sufficiently established.

The next question is whether this contract was made under such circumstances as would render it null and void. This pumping was carried on night and day, and the water rose in the schooner at the rate of a foot for every 10 minutes, or 6 feet per hour. It was absolutely essential that this pumping should be continuous until the water in the hold was controlled, and it was not under control until after the expiration of 6½ days from the time the pumping began. Capt. Avery's statement was that $25 per hour for a short time was reasonable, that $20 per hour was his regular price, and that he reduced the price to $10 per hour on account of the time it was supposed the pumping would be continued. It is true that for some portions of the time the pumps were only pumping at half speed, but this was owing to the fact that sometimes the water would be reduced so low that the pumps would not reach it; but the tug had to lie by the schooner continuously, and its pumps were practically in continuous operation. According to the evidence, taking into consideration the wages and expenses of the crew of the tug, and also the cost of the coal consumed, it appears that the cost of operating the tug and its pumps for a day of 12 hours was about $50. When we consider the wear and tear and depreciation of the tug and its machinery, as well as the interest on the investment (the tug was worth $30,000), and the fact that the pumps were operated 24 hours a day, and therefore a double shift of men was required, and all the other elements which enter into such matters, it is quite probable that the expense of operating the tug's pumps for a continuous day of 24 hours would

probably amount to $100 or more. It is reasonable that the libelant would also expect a fair profit on this expense. The contract price was $10 an hour, or $240 per day. The court is of the opinion that this contract price, while reasonable for an operation continuing over a period of a day or two, is rather high for a period of 6½ days.

However, the court is of the opinion that the price is not so unreasonable as of itself to vitiate the contract, if it is otherwise valid. The contract was not made out at sea, under circumstances of danger or duress. It was made in the city of Savannah, where the services of others might have been secured, and after full time for deliberation. Mr. Farie, the insurance agent, who appeared to have had some interest in the matter, and who was called into consultation, although disclaiming having authority to represent the cargo or any one else in the transaction, did not object to the price. Capt. Foxwell was a part owner, and the other owners were in Philadelphia. He testified that he was at liberty, so far as Avery was concerned, to call any one else to do the pumping, and that Capt. Avery did not try to coerce him, and that the contract was entirely voluntary on his part, and that he made it as a business proposition, because he thought it best for the ship. He considered himself free to employ any one else. He testified that he was a $^{24}/_{64}$ owner of the vessel, and he thought, if he could get the vessel pumped and unloaded, that the price would not be too much, and he thought that the pumping might continue for a week. It is true that under cross-examination Capt. Foxwell said that he understood that the schooner was in the possession of Capt. Avery, and that he did not feel as a free man to make a contract with him after he pulled the schooner up the river. Yet he testified that he did not understand that Capt. Avery might object to his employing some one else, and said that he considered the price reasonable, and he repeated several times that he considered himself free to employ any one else if he chose.

Taking all of the evidence as a whole, and taking into consideration the fact that the contract was entered into openly, after full deliberation and consideration, and was made in the city of Savannah, where prices could have been obtained from other people, and both parties had equal means of knowledge, and where the parties at interest could have put an end to the contract promptly if they were dissatisfied with it, and considering, also, the apparent fairness of Capt. Avery, who advised Foxwell to consult with the owners of the cargo before making the contract, the court is of the opinion that no advantage was taken by the libelant or its manager, Capt. Avery, and that the contract was free from fraud, duress, compulsion, or other circumstances which would render the same null and void in law or equity. I therefore think that the same should stand. Capt. Foxwell seems to have been perfectly willing to make the contract, and neither he nor Mr. Farie demurred to same. Had the same not been considered reasonable, Capt. Foxwell should have made an effort to procure some one else, and if he had gotten a better bid no doubt Capt. Avery would have allowed the other person to have done the pumping. In view

234 F.—46

of the circumstances existing at the time, it seemed then to be fair and reasonable, and the fact that it may afterwards have turned out to be a very profitable contract (if, indeed, such was the case) is no reason to set the same aside. An interesting pumping contract case, showing cost of pumping and price charged for same, is that of The Tornado, 109 U. S. 110, 3 Sup. Ct. 78, 27 L. Ed. 874.

Although it was formerly held that contracts for salvage are always subject to be revised in the discretion of the admiralty court, the Supreme Court of the United States, in the leading case of The Elfrida, held that such contracts will not be set aside simply because the compensation is excessive, and that they, like other contracts, will be upheld when entered into fairly by the parties, with full knowledge of all the facts, without fraud, compulsion, or duress, and that while it is not necessary, in order to impugn a salvage contract, to show such duress as would require a court of law to set aside an ordinary contract, yet "where no circumstances exist which would amount to a moral compulsion, the contract will not be held bad simply because the price agreed to be paid has turned out to be much greater than the services were actually worth." The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413; Benedict on Admiralty (4th Ed.) § 226; The Thornley (C. C. A. 5th Circuit) 98 Fed. 735, 741, 39 C. C. A. 248; The Stanley H. Miner (D. C.) 172 Fed. 486; The Myrtle Tunnel (D. C.) 146 Fed. 324.

The court is therefore of the opinion that the contract is valid, and should stand, as between the ship owner and the libelant, the salvor, and also, as explained below, as between the cargo owner and the salvor.

[2] The next question would be as to what would be the compensation of the libelant for rescuing the schooner from the North Breaker, and for the services of pumping the water out of its hold, and towing it to the Municipal Dock in Savannah. There was no contract for these services. The court is of the opinion that the services thus rendered were not of a very high order of merit. Still the schooner was in a perilous position, and under the evidence would have certainly gone to pieces, and it and its cargo would have been a total loss, had it not been for the services of the libelant. These services were rendered promptly, skillfully, and efficiently. As stated by one of the witnesses, "The tug arrived just in time to save the schooner's 'bacon.'" The sands of the breaker in question are of the quicksand variety, and, under decisions rendered in similar admiralty cases occurring along the South Atlantic coast, these quicksands have been judicially declared to be very dangerous. The Agnes I. Grace (D. C.) 49 Fed. 662; The Sandringham (D. C.) 10 Fed. 562; The Egypt (D. C.) 17 Fed. 360; The Mary E. Dana (D. C.) 17 Fed. 353; The Alamo, 75 Fed. 602 and page 607, 21 C. C. A. 451; The Craster Hall (D. C.) 203 Fed. 188; Id. (C. C. A. 5th Circuit) 213 Fed. 426, 130 C. C. A. 72. There was, however, no danger to life, either to the crews of the schooner or of the tugs engaged in the operation. The time consumed in the operation of extricating the schooner from its perilous situation was only four hours, yet the shortness of this time is to the credit of

723 of THE HUMAROCK

the salvors. The value of the two tugs engaged in the operation was about $60,000. They saved the schooner and its cargo, without the loss of any part of the ship or the lumber.

There were two stages in the salving operations. The first was in pulling the schooner off the breaker and getting it into a port of safety; and the second was in keeping it afloat by pumping the water, which was rapidly flowing into it through the hole made by its anchor and through the open seam. The first stage of the operation was not covered by a contract; the last was covered by a contract. We see no reason in law or equity why a contract should not be made as to a portion of the operations. A contract is often made after operations have begun, as was done in the case of The Thornley, cited above. Especially can this be done when a portion of the operation is to move along certain definite lines, as in the case of pumping. Therefore the court is of the opinion that the contract should not fall on account of the fact that it was entered into after the vessel had been partially saved. However, it is proper to look at the transaction in its entirety as one whole, so that the total amount of salvage awarded will not be disproportionate on the one hand, and so that it will adequately compensate the salvors on the other. Taking into consideration the fact that the libelant probably made a very profitable contract for keeping the vessel pumped out, the court is of the opinion that the same may be considered as a circumstance in making the award for the first part of the salving operations. Such being the case, the court is of the opinion that 10 per cent. of the value of the vessel and cargo saved would, in view of the amount of the award for the pumping operations, be proper and reasonable.

The ship brought at the sale $4,401, and the cargo of lumber $2,128.15, making a total of $6,529.15. From this should be deducted the marshal's expenses for protecting and selling the property, $520.08, and the expenses of discharging the schooner, $522.30, making a total of $1,042.38, which leaves a balance of $5,486.77, on which salvage is to be calculated. Ten per cent. of this amount is $548.68, which the court hereby awards for the first stage of the salvage operation above mentioned, which, added to the $1,560 on the pumping contract, makes $2,108.68, which is hereby awarded as salvage to the libelants in this case.

2. While the pumping contract is, in the opinion of the court, binding between the salvor and the ship owner, yet the court is of the opinion that this contract is not binding as a contract so far as the cargo owner is concerned. Such contracts are upheld as affecting the rights of cargo owners entirely on the ground of necessity. In this case, however, the master knew who the cargo owner was. He knew the agent of this cargo owner in Savannah. He could have consulted this agent. There was no necessity, therefore, for him to make a contract without the consent of the agent, and consequently the contract, so far as the cargo owner is concerned, must fall. In volume 26 of the Laws of England, by the Earl of Halsbury, published in 1914 by Butterworth & Co., London, on page 573, the rule is laid down in the following language:

"The owner of the cargo on board the salved vessel is not bound by a salvage agreement made by the master, and it is open to him to dispute the reasonableness of the reward fixed by it."

Mr. Congdon, in his treatise on General Average, bottom of page 97 and top of page 98, lays down the rule as follows:

"The ship owner may, in some cases, by reason of a contract or otherwise, be primarily liable as between him and the salvor for the whole amount agreed upon for the latter's services to the vessel and cargo, but as neither he nor the master can bind the owners of the cargo by any contract with a salvor, the whole amount is chargeable to general average only when it can be shown that it was a reasonable one for the services rendered for the common benefit of the vessel and cargo."

The court is of the opinion, that in the light of subsequent events the contract turned out to be rather high, and yet for reasons stated above, it should be sustained as between the ship owner and the salvor, because it was made between the salvor and the ship owner fairly and after full opportunity for consideration and deliberation. However, the cargo owner is not bound by this contract because, as stated above, it could only be bound in cases of emergency or necessity where it could not be consulted, which was not the case here. Astsrup v. Lewy (D. C.) 19 Fed. 536, 541. However, it is the view of the court, as above expressed, that the services rendered by the libelant should be considered in their entirety, beginning at the time the schooner was found in distress, and ending when the pumping operations ceased. The court is of the opinion that if the operations had stopped at the end of the first day, and if the schooner had then proceeded on its voyage without having to be pumped for 6½ days in the port of Savannah, the libelant should have been awarded 25 per cent. as salvage. It has reduced the salvage award on account of the profitable nature of the pumping contract afterwards entered into. If the cargo owner is allowed to go behind this contract, and have it reduced, then, inasmuch as the pumping contract was considered by the court and given effect in reducing the award for the first stage of the salving operations, the cargo owner should have to pay its proportion of the full value of the first stage of the salving operations, which the court thinks, considered alone, would be reasonably worth 25 per cent. of the property saved. What the cargo owner would gain in one case it would lose in the other, and in the end it would be put on an equality with the ship owner. Such being the case, the court is of the opinion that the cargo owner should stand its proportion of the entire salvage award made above, to wit, its proportion of the sum of $2,108.68.

3. The libel in this case was against the schooner, its tackle, apparel, and appurtenances, and also against the cargo, and under it the ship and cargo were duly seized by the marshal. Thereafter the Hirsch Lumber Company, the owner and claimant of the cargo duly filed its petition and intervening libel against the schooner, claiming damages against it for any salvage or expenses that might be awarded against the cargo upon the libel in favor of the salvor, and also for damages to the cargo of lumber on account of the stranding of the schooner,

alleging that the owners of the schooner were at fault and the master incompetent, and that the stranding was due to the same, and praying that process issue against the schooner, its tackle, apparel, and furniture, and that all persons claiming any interest therein should be cited to appear and answer its petition, and that the schooner should be condemned and sold to pay the damages sustained by the cargo, and also praying for general relief.

The claimants and owners of the vessel contend that the cargo owner has no rights under its said intervening libel, for two reasons: (1) Because, as contended by them, the cargo owner is limited in this case to a proceeding in rem and cannot proceed against the owners in personam; and (2) because, as contended by them, the ship owners are protected by the provisions of Act Feb. 13, 1893, c. 105, known as the "Harter Act" (U. S. Comp. Stat. 1901, p. 2946).

[3] (a) In their brief counsel for the owners of the vessel say that the petitions which the cargo owner filed are in terms proceedings in rem against the Humarock, and are not proceedings in personam against the vessel owners. They contend that the intervener must necessarily proceed under the thirty-fourth and forty-third rules in admiralty; that the court has a fund to administer, and that it can distribute the fund only among those persons who have vested liens in the same; that the claim of the cargo owner is one in personam, and that, therefore, the court cannot consider in this case such personal claim which the cargo owner may have against the ship owner in his individual capacity.

It is the opinion of the court that the cargo owner is rectus in curia. Under the well-settled principles of the admiralty law it has a maritime lien on the vessel for any damages sustained to the cargo after the same was delivered in the vessel. As stated by Mr. Justice Davis, in The Keokuk, 9 Wall. 517, at page 519, 19 L. Ed. 744:

"It is a principle of maritime law that the owner of the cargo has a lien on the vessel for any injury he may sustain by the fault of the vessel or the master."

The second headnote in The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772, is in the following language:

"The owner of the cargo has a lien by the maritime law upon the ship for the safe custody, due transport, and right delivery of the same."

See, also, The Belfast, 7 Wall. 624, at page 642, 19 L. Ed. 266; The John G. Stevens, 170 U. S. 113, at pages 122, 123, 18 Sup. Ct. 544, 42 L. Ed. 969; The Queen of the Pacific (D. C.) 61 Fed. 213, at page 215; 36 Cyc. 263, 264, 277; 26 Cyc. 752.

[4] (b) The ship owner claimed immunity under section 3 of the Harter Act, mentioned above, which is in the following language:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from the faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or

public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

Before the passage of this act, the vessel owner as a common carrier was liable to the cargo owner for all damages to the cargo, except those caused by the act of God, the public enemy, or from the inherent qualities of the cargo itself. The Harter Act was passed in order to modify this stringent rule of liability, and to encourage shipping in the United States. Under its terms, above quoted, neither the vessel nor its owner can be held "responsible for damage or loss resulting from faults or errors in navigation or in the management of the vessel," provided such owner shall exercise due diligence "to make the vessel in all respects seaworthy and properly manned, equipped, and supplied." As stated by Mr. Benedict, in his treatise on Admiralty (4th Ed. § 229):

"This section of the act is intended to relieve the ship owner who has done all that he can do to start off a well-fitted expedition, from liability for damages caused by faults or errors of his shipmen after the ship has gone below the horizon and away from his personal observation."

In other words, after the ship owner has exercised due diligence in providing a seaworthy vessel, properly equipped, manned, and supplied, and starting it out on a voyage, he is not liable for damages resulting from the negligence of his agents and employés in charge of the vessel; he is only liable for his own personal negligence or fault, and the negligence of his agents and employés cannot be imputed to him. As stated by the court in the case of Great Lake Towing Company v. Mills Transportation Company, 155 Fed. at page 16, 83 C. C. A. at page 612, 22 L. R. A. (N. S.) 769:

"The purpose of Congress was, as we think, to relieve the ship owner from the consequences of those extraordinary risks which were imposed without limitation by the law of admiralty as that law had been interpreted in this country. And by extraordinary risks we mean those risks arising from the conduct of, and contracts made by, those who are beyond the personal supervision and control of the owner and yet have legal authority to bind him to answer for their conduct or contract; or, to express the thought in another way, that the liabilities intended by this legislation were those peculiar to him as a ship owner and had been imputed to him because of his relation to the ship, and not those liabilities, whether for torts or from contracts, which spring from his own personal conduct or stipulations."

It is necessary, therefore, to determine whether the ship owner in this case exercised due diligence in the particulars required of him by the third section of this act. The evidence on this question in the record is somewhat meager, and no direct issue seems to have been made on this point in the trial of the case.

Capt. Foxwell, the master of the schooner, testified that the vessel was a good vessel, a strong vessel, and fit to go anywhere. He also testified that, when the vessel left Savannah to go on its voyage, it was in "good condition, properly manned and equipped, and everything in good shape." Capt. Foxwell was asked whether he had been in and out of the port before, and he replied that he had been trad-

ing to Savannah off and on for 10 years, that he knew the Savannah river, and could go in and out over the bar with wind in the daytime. As shown by the evidence, the Humarock was a small schooner of only 500 tons burden, and Capt. Foxwell was owner to the extent of $^{24}/_{64}$, or ⅜. As stated above, he had been in and out of the port of Savannah off and on for 10 years, and had been master of the Grace Seymour, another schooner, for 7 years. We think that by this evidence the ship owners have carried the burden of diligence imposed upon them by the act in question, and shifted the burden to the cargo. It is clear from the evidence that the stranding did not occur on account of any lack of seaworthiness, or lack of equipment or supplies, on the part of the vessel. It occurred from an error in navigation, or in the management of the vessel, due, as claimed by the cargo owner, to the negligence of the master. All the other requirements of the statute, therefore, can be eliminated from the determination of the questions here involved, except the requirement that the vessel should be "properly manned."

There is no contention that it was not "properly manned," except as to the master. The direct evidence in the case as above pointed out shows that the vessel was "properly manned." We think this made out a prima facie case of competency on the part of the master, and it then became necessary, if the cargo owner would succeed in its contention, for it to introduce evidence to show to the contrary, which it failed to do. Reference is made in the brief of counsel for the cargo owner to certain evidence which was taken at Philadelphia. This evidence, however, was taken entirely with reference to the claims of certain persons who had furnished materials and supplies to the Humarock, and these witnesses were not examined with reference to the point now in question. None of this evidence sustains the contentions of counsel for the cargo owner, in the opinion of the court.

There is nothing in the way the stranding occurred to show incompetency on the part of the master, or to contradict the prima facie case of competency made out by the evidence above quoted, as was the case in The Cygnet, 126 Fed. 742, 61 C. C. A. 348, referred to in the brief of counsel for the cargo owner, where the court held that the offending vessel was not relieved, because the evidence showed that the negligence of the master caused the collision, and that this negligence was "so gross as to raise so strong a presumption of fact that the master was not competent as practically to throw the burden on the vessel owners to establish that they used due diligence with reference to his selection, whether the statute does or not impose such a burden," and that this presumption was not overcome by the evidence for the vessel owners. In the case at bar, however, the negligence of the master was not gross, and did not in the opinion of the court show any incompetency on his part so as to overcome the general evidence as to his competency referred to above.

Counsel for the cargo owner referred at some length in their brief to the language of the District Court in The Fri, 140 Fed. 123, at pages 124 and 125. In that case the evidence revealed that the master had been a sailor since 1878, taking part in many and varied voyages, and that for 15 years he had been master of sailing vessels. The District

Court held that this was not sufficient evidence to show due diligence on the part of the vessel, nor in the selection of a proper master, but that the ship owner should have introduced further testimony as to his habits, fidelity, caution, diligence, and other qualifications for the performance of his duty. The Court of Appeals of the Second Circuit, however, reversed the District Court below (The Fri, 154 Fed. 333), and at the top of page 336 used the following language:

"It appeared by the proofs, and was undisputed, that the master for over 15 years had navigated ocean vessels as master in many seas. Before he was appointed to the command of the Fri by her owners, he had been in command of another steamship of theirs for over a year, and he had made several voyages in command of the Fri before the voyage upon which the disaster took place. They had had an ample opportunity to estimate his capacity. It would seem to be holding them to an extreme and impracticable rule of diligence to require them to give better proof of his general competency than was actually shown."

The court does not think that the stranding of the vessel shows any incompetency on the part of the master. It shows a mere fault or error in navigation, or in the management of the vessel, from which the owners of the ship are protected by the express language of the section in question. This section was passed by Congress in order to meet just such a case as the one at bar as same appears to the court, and the court is bound to give effect to the same. The court, therefore, holds that the ship owners are protected by the Harter Act against the claim of the cargo owner in this case, except as to the ⅜ interest owned by Capt. Foxwell, the master, as hereafter explained. Hanson et al. v. Haywood Bros. et al., 152 Fed. 401, 81 C. C. A. 527 (C. C. A. 7th Circuit); The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Merida, 107 Fed. 146, 46 C. C. A. 208 (C. C. A. 2d Circuit); The Rosedale (D. C.) 88 Fed. 324, at page 328; The Nettie Quill (D. C.) 124 Fed. 667; The Sandfield, 92 Fed. 663, 34 C. C. A. 612.

(c) The court is, however, of the opinion that the stranding of the vessel was negligent—Capt. Foxwell being negligent in the management of the vessel at the time of the stranding. In his testimony Capt. Foxwell stated that he told the pilot not to forget to meet the vessel, because he (Capt. Foxwell) was not too well acquainted with the locality. In the answer which was filed by the vessel owners to the libel, and which was sworn to by Capt. Foxwell, it was denied that Capt. Foxwell told the pilot that he was perfectly familiar with the course, and could go out to sea without any trouble, and it was stated that, on the contrary, the master relied entirely upon the advice of the pilot, and relied upon him to come to him as soon as the sails were raised. The evidence shows that Capt. Foxwell, on the morning in question, raised his sails and began his course down the river towards the sea. He states that he hoisted a signal for the pilot, who was out at the pilot boat at the ocean bar about five miles distant; but the pilot denies he saw the signal. There are two theories in the case—one, that advanced by the pilot, that the master attempted to go to sea without a pilot; the other, as testified by Capt. Foxwell, that after raising his sails and giving the signal for the pilot he began going down the channel in momentary expectation that the pilot would meet him. The

pilot does not testify positively that no signal was hoisted for him; he merely testifies negatively that he saw no such signal. If a signal was hoisted for the pilot, and he did not respond, the evidence shows that despite this fact the vessel, under a light breeze, continued its course down the Savannah river towards the sea, a distance of two or three miles, and that the wind then died out, and the current carried the vessel northwardly out of the channel, where Capt. Foxwell anchored it in sufficient water at the time, but in about three-quarters of an hour the ebbing tide left his schooner, which drew 16 feet of water, stranded on the sand bank, which is shown on the government chart, where the water at low tide measured only from 10 to 13 feet. We cannot hold that these facts show any general incompetency on the part of the master, but think that they merely show fault or negligence in the management of the vessel. According to his own statement, although he could go in and out of the Savannah river with proper wind in the daytime, yet on the occasion in question he thought he was not able to do so without a pilot. Notwithstanding this fact, instead of waiting after raising his sails and his signal until the pilot came, he proceeded down the river for two or three miles, and, instead of staying in the channel, anchored upon the North Breaker, where his vessel was stranded. Proper prudence and diligence on his part, in the opinion of the court, required that he should not have attempted to go down the river in this way without a pilot, and that if he hoisted the signal for the pilot, as he claimed, he should have waited for the pilot before proceeding down the river. Several witnesses testified that this showed a lack of due care on his part. It is the conclusion of the court, therefore, that the stranding was brought about by a fault or error in navigation, or in the management of the vessel, on the part of the master.

[5] (d) Under the provisions of the Harter Act, however, since the owners of the ship exercised due diligence in the particulars required by the statute, as set out above, this negligence on the part of the master cannot, in the opinion of the court, be imputed to the other ship owners, as they did not personally participate in the same. As far as the other ship owners are concerned, Capt. Foxwell was as to them only the master of the ship, and only their employé. The court does not think that his negligence can be imputed to them. The court, however, is of the opinion, that as far as his interest is concerned, which is a ⅜ interest, inasmuch as the accident was caused by his negligence, the provisions of the Harter Act do not relieve his interest from liability to the cargo owner. The court is therefore of the opinion that, while the cargo owner cannot in its intervening petition claim damages against the entire ship, or all the interests in the ship, it yet has a maritime lien for its damages against the ⅜ interest owned therein by Capt. Foxwell. The court does not find any direct authority on this precise point, and yet it is of the opinion that the position here taken is in accordance with the principles of equity and the provisions of the act in question.

A question somewhat similar arose under what is known as the Limited Liability Act (Revised Statutes, §§ 4283, 4285 [Comp. St. 1913, §§ 8021, 8023]), in Re Leonard et al. (D. C.) 14 Fed. 53. In that

case Judge Brown held that although the master, who was a part owner, was privy to the negligence which caused the loss in that case, the other innocent part owners might have the benefit of the statute. The court is of the opinion that the same principle is applicable to the case at bar. The court is therefore of the opinion that the cargo owner is entitled to a lien against the ⅜ interest in the Humarock owned by Capt. Foxwell, or in the proceeds of the same, for the portion of the salvage award chargeable against it in this case, as well as the portion of the expenses of discharging the cargo chargeable against it, and for any other damages sustained by it, and that this lien or claim is superior to the lien for previous supplies claimed by certain interveners in the case.

It would seem, also, that Capt. Foxwell has no lien for the advances which he made to the ship, as such are matters of accounting between him and the other part owners of the vessel. 26 Cyc. 757. The fund in court should therefore be distributed as follows:

(1) To the payment of all court costs and expenses, including the marshal's extra compensation, except as to the costs and expenses (including costs of taking testimony) of such claims and libels as are held to be of inferior rank, the costs and expenses attending any claim to have the same rank as the claim itself.

(2) To the payment of the Paulsen claim for discharging the vessel's cargo.

(3) To the payment of the salvage award of $2,108.68.

(4) To the payment of the crew's wages.

(5) To the payment out of the ⅜ interest in the fund owned by Capt. Foxwell of the amount of salvage and expenses chargeable to the Hirsch Lumber Company, and the damages to the cargo sustained by it.

(6) The balance of the fund owned by the other vessel owners shall be distributed to the payment of the claims of the other interveners according to their relative rank and priority.

There may be a distinction between the rank of wages of the crew earned prior to the stranding and those earned subsequent to the stranding, and it may be, also, that the claim of the Hirsch Lumber Company is superior to the wages of the crew earned prior to the stranding of the vessel; yet as the amount of the wages is small, and they have already been paid by consent by order of the court, it is not necessary to discuss this question.

A decree may be drawn in accordance with this opinion.